**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 30th day of June, two thousand twenty-six.

Present:

DEBRA ANN LIVINGSTON,
*Chief Judge,*
RAYMOND J. LOHIER, JR.,
RICHARD J. SULLIVAN,
JOSEPH F. BIANCO,
MICHAEL H. PARK,
WILLIAM J. NARDINI,
STEVEN J. MENASHI,
EUNICE C. LEE,
BETH ROBINSON,
MYRNA PÉREZ,
ALISON J. NATHAN,
SARAH A. L. MERRIAM,
MARIA ARAÚJO KAHN,
*Circuit Judges.*

_____

JEREMY KELLOGG, JONATHAN HARMON,

 *Plaintiffs-Appellants,*

 v.         23-8093

JONATHAN D. NICHOLS, individually and in his capacity as statutory licensing officer pursuant to Penal Law 265.00(1); 400.00 *et seq.*,

*Defendant-Appellee.*

_____

| | |
|---|---|
| For Plaintiffs-Appellants: | Amy L. Bellantoni, The Bellantoni Law Firm, PLLC, Scarsdale, NY. |
| For Defendant-Appellee: | Jonathan D. Hitsous, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General for the State of New York, Albany, NY. |

Following disposition of this appeal on August 18, 2025, an active judge of the Court requested a poll on whether to rehear the case *en banc*. The panel amended its opinion on March 5, 2026, and Appellants filed an additional petition for rehearing *en banc*. A poll having been conducted and there being no majority favoring *en banc* review, the petitions for rehearing *en banc* are hereby **DENIED**.

Raymond J. Lohier, Jr., *Circuit Judge*, concurs by opinion in the denial of rehearing *en banc*.

Alison J. Nathan., *Circuit Judge*, concurs by opinion in the denial of rehearing *en banc*.

Richard J. Sullivan, *Circuit Judge*, joined by Debra Ann Livingston, *Chief Judge*, Joseph F. Bianco, Michael H. Park, William J. Nardini, and Steven J. Menashi, *Circuit Judges*, dissents by opinion from the denial of rehearing *en banc*.

Steven J. Menashi, *Circuit Judge*, joined by Michael H. Park, *Circuit Judge*, dissents by opinion from the denial of rehearing *en banc*.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

LOHIER, *Circuit Judge*, concurring in the denial of rehearing in banc:

I concur in the denial of rehearing in banc for the reasons stated in the amended panel opinion, *Kellogg v. Nichols*, 170 F.4th 20 (2d Cir. 2026), which responds to virtually all of the concerns expressed by dissenting colleagues and others about its rationale and result. I write separately only to dispel some misimpressions left by the accompanying opinions of colleagues.

## I

The central issue raised by our in banc quarrel is whether the Plaintiffs (more on them in a moment) can mount a *facial* constitutional challenge to a state statute by suing in his official capacity the sitting state court judge who ruled against them based on his reading of the statute and assessment of the facts. If the Plaintiffs cannot, then their suit is barred by Article III's case-or-controversy requirement because the judge lacks any personal or institutional stake in the constitutional dispute. In the extremely limited circumstances presented by this appeal, the amended panel opinion concludes that the suit is barred.

## A

The Defendant, Judge Jonathan D. Nichols, is a New York state judge with

1

the statutory authority, among other things, to rule on firearms license applications under New York law. *See* N.Y. Penal Law § 400.00. In his years on the bench, Judge Nichols has both granted and denied a number of these applications.

This case arises from Judge Nichols's review of applications filed by Jeremy Kellogg and Jonathan Harmon, the Plaintiffs. In connection with each application, Judge Nichols held a hearing during which he advised them that they had a right to be represented by an attorney and to call witnesses. *See* Dist. Ct. Dkt. No. 6 Exs. 4–5. Both declined, electing instead to testify under oath by themselves in separate proceedings. Judge Nichols questioned them about their license applications, which asked, among other things, "have you ever been arrested, summoned, charged, or indicted anywhere for any offense, including DWI[,] except for traffic infractions?" *See* Dist. Ct. Dkt. No. 6 Ex. 4, at 6.

Kellogg's hearing went poorly from the start. Judge Nichols observed that Kellogg's application, which had been submitted to the local sheriff's office, failed to truthfully disclose two arrests: the first for petty larceny and the second for criminal assault. Initially, Kellogg disclaimed his arrest for petty larceny; when pressed, he then acknowledged that he simply "forgot" about that arrest. *See* Dist.

2

Ct. Dkt. No. 6 Ex. 4, at 4–5.  As for his second arrest for assault, Kellogg at first protested that he didn't have to disclose it because it was sealed; but he eventually testified that he "forgot" about that arrest as well.  *See* Dist. Ct. Dkt. No. 6 Ex. 4, at 5–7.

Harmon's hearing fared somewhat better than Kellogg's but yielded the same result.  Harmon, a mechanic and one-time security officer, testified that he'd been convicted of participating in an armed robbery, for which he spent nine months in jail; arrested for possessing an illegal knife in a public place; and arrested for driving while intoxicated, which resulted in a revoked drivers' license.

Not long after the hearings, Judge Nichols issued individual decisions denying each application.  He found Kellogg not credible based on Kellogg's shifting explanations for concealing his criminal history on his application.  And he denied Harmon's application because of Harmon's criminal history and "willingness to knowingly violate the Penal Law for [his] own purposes," his presentation and demeanor during the hearing, and his lack of "maturity or responsibility to hold a pistol license."  Having denied the applications, Judge Nichols's job was done.

3

B

To this day, neither Kellogg nor Harmon has attempted to directly reconsider, appeal, rescind, or otherwise challenge Judge Nichols's denial of their applications on legal or factual grounds that might apply to them. *See Mendez v. Heller*, 530 F.2d 457, 459 (2d Cir. 1976) (finding no adversity where a plaintiff challenged the constitutionality of divorce proceedings but "ha[d] made no attempt to secure a divorce"). Nor have they ever claimed that Judge Nichols contravened New York State law. Instead, they decided to file a lawsuit in federal court against Judge Nichols (and *only* Judge Nichols) that challenges the constitutionality of New York's firearms licensing scheme and seeks to enjoin the enforcement of any criminal penalties for possessing firearms without a license.

In mounting their facial challenge and seeking declaratory and injunctive relief, the Plaintiffs could have named the officials who enacted, enforce, or otherwise have a personal or institutional stake today in upholding the challenged set of state statutes. But they did not. And there's been no showing that Judge Nichols, the only named defendant in this litigation, has any stake in this fight about the statute. In fact, the present federal litigation is entirely unrelated to what Judge Nichols did or did not do, can or cannot do.

4

One of my dissenting colleague's misunderstanding of the Plaintiffs' claims for relief in this litigation illustrates why Judge Nichols is the wrong defendant and this case the wrong vehicle for an in banc proceeding. The dissent asserts that "an order stopping state officials from enforcing New York's criminal firearms laws against Kellogg and Harmon (should they somehow manage to procure a firearm) would not give them . . . the relief that they ultimately seek" since "not being prosecuted for illegally possessing a firearm is not the same as having a license to legally purchase a firearm." Sullivan, *J.*, Dissenting Op. at 25–26 n.6. The dissent's description of what Kellogg and Harmon want—"a license to legally purchase a firearm"—is wrong. Sullivan, *J.*, Dissenting Op. at 25–26 n.6. In fact, neither Kellogg nor Harmon continues to seek a gun license. Instead, they've opted to go for broke: they seek facial relief that would declare New York's entire firearms licensing statutory scheme unconstitutional and enjoin New York from criminalizing possession of firearms without a license. *See* App'x 28–29. In other words, they want their guns *without any* license. In pursuing such broad relief, the amended panel opinion makes clear, Kellogg and Harmon "chose the wrong target." *Kellogg v. Nichols*, 170 F.4th 20, 28 (2d Cir. 2026).

5

Taking seriously Article III's adversity requirement, *see Muskrat v. United States*, 219 U.S. 346, 361 (1911), and this court's "special obligation" to assure ourselves of subject-matter jurisdiction, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986), the amended panel opinion concludes simply that the Plaintiffs have failed to name an adverse party as a defendant.

## II

The panel opinion's holding that Article III adversity between the Plaintiffs and Judge Nichols is lacking under the peculiar circumstances of this case reflects neither a broad pronouncement about adversity nor a deviation from precedent. To the contrary, that result flows from *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39–40 (2021), and *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 124–25 (2d Cir. 2020).

## A

First, *Whole Woman's Health*. The plaintiffs in *Whole Woman's Health* challenged the constitutionality of the Texas Heartbeat Act, which permitted private litigants to bring civil claims against those who performed or assisted abortions. *See* 595 U.S. at 35–37. In asking a federal court to declare the Act unconstitutional and enjoin its enforcement, the plaintiffs sued a state court judge

(in his official capacity) who adjudicated claims filed under the state statute. *Id.* The Supreme Court determined that the plaintiffs' claims ran head-long into "Article III of the Constitution," which "affords federal courts the power to resolve only 'actual controversies arising between adverse litigants.'" *Id.* at 39 (quoting *Muskrat*, 219 U.S. at 361). "[N]o case or controversy exists," the Court explained, "between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *Id.* at 40 (quoting *Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984)). This is because "[j]udges exist to resolve controversies about a law's meaning or its conformance to the Federal and State Constitutions, not to wage battle as contestants in the parties' litigation." *Id.* The lack of adversity identified in *Whole Woman's Health* means that a judge engaged in the neutral adjudication of rights under a state statute is typically not the proper defendant in a suit challenging the constitutionality of the statute under 42 U.S.C. § 1983. *Id.*

Many of us may have understandable misgivings about the holding in *Whole Woman's Health* to the extent it "foreclos[es] suit against state-court officials," *id.* at 63 (Sotomayor, *J.*, dissenting in part), and closes rather than opens "the courthouse door[s]," *Mandala v. NTT Data, Inc.*, 988 F.3d 664, 683 (2d Cir.

7

2021) (Lohier, *J.*, dissenting from the denial of rehearing in banc).  For that reason, I appreciate that some colleagues have sought to distinguish the holding in that case to avoid the result in this one.  I offer a few observations.

First, as the amended panel opinion describes, it's a stretch to distinguish *Whole Woman's Health* or to suggest that it is irrelevant to our resolution of this appeal.  Plaintiffs Kellogg and Harmon, like their counterparts in *Whole Woman's Health*, sought to "attack[] the constitutionality of the [entire] statute" and bar its enforcement.  *Whole Woman's Health*, 595 U.S. at 40 (quotation marks omitted).  And like the plaintiffs in *Whole Woman's Health*, the Plaintiffs here opted to name as a defendant a state judge who is a neutral adjudicator under the challenged statute and is "in no sense adverse to the parties" who mount the challenge.  *Id.* at 61 (Roberts, *C.J.*, concurring in part).

Second, despite "the many remedial questions" that *Whole Woman's Health* left open, *id.* at 41, the courthouse doors remain open to Kellogg and Harmon and to plaintiffs like them.  For one thing, Judge Nichols's licensing decisions are not "insulate[d]" from review.  Sullivan, *J.*, Dissenting Op. at 2.  As the amended panel opinion clarifies, the Plaintiffs could have sought judicial review of Judge Nichols's licensing decision in an Article 78 proceeding under New York law.

8

*Kellogg*, 170 F.4th at 30–31. Or they can pursue their distinctive litigation strategy of opposing the criminal enforcement of New York's firearms licensing scheme by suing the executive officials whose interests are genuinely adverse by virtue of their stake in enforcing and defending the scheme itself. *See id.* at 29 n.7.

Lastly, whatever our shared reservations about *Whole Woman's Health*, "it is [the Supreme] Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). Until then, we "apply[] [the Court's pronounced] principle[s] despite disagreement." *Id.*

## B

If there were any doubt about whether *Whole Woman's Health* applies to the facts of this case—because, say, Judge Nichols acted as an executive licensing official rather than as an impartial (judicial) adjudicator—that doubt is dispelled by *Libertarian Party*. There our Court considered what state judges actually *do* under New York Penal Law § 400.00—the same New York State firearms licensing scheme at issue in the case before us. We understood the statute as "plac[ing] the authority to decide firearms license applications in state judges" and empowering those judges to render "a decision in relation to a particular case." *Libertarian Party*, 970 F.3d at 117 (quotation marks omitted). Under the statute, we

9

said, judges "decided the merits of the applicants' requests," and issued

"rulings . . . referring in detail to the factual and statutory basis for the denial,"

including the "relevant requirements of [state law]." *Id.* at 124–25. These

functions taken together, we said, entail the "adjudication of particularized,

existing issues" and are "the principal hallmark[s] of the judicial function." *Id.* at

117, 124 (cleaned up).

It is not possible to ignore *Libertarian Party*'s conclusion that what judges

actually *do* under New York Penal Law § 400.00 amounts to a "quintessentially

judicial act." *Id.* at 124. That holding surely informs our analysis. In response,

some colleagues point out that the state judges in *Libertarian Party* relied on

judicial immunity rather than the absence of Article III adversity to defend against

the official-capacity claims against them. *See* Sullivan, *J.*, Dissenting Op. at 25;

Nathan, *J.*, Concurring Op. at 10–11. But the amended panel opinion describes

how the "rationale for recognizing such decisions as judicial rather than

administrative for purposes of determining judicial immunity in *Libertarian*

*Party*, 970 F.3d at 125, applies equally for purposes of determining jurisdiction"

even keeping in mind the different constitutional histories and interests the two

doctrines bring with them. *Kellogg*, 170 F.4th at 28. State judges applying § 400.00

10

do not cease to issue "rulings" and to neutrally apply law to facts only because what they do is analyzed to determine adversity rather than immunity. *See Libertarian Party*, 970 F.3d at 124–25. But as both the amended opinion and *Whole Woman's Health* suggest, describing what they do as "judicial" is also not the end of the analysis under Article III. To the contrary, when plaintiffs mount a facial challenge to a state statute by suing the judge who adjudicated the claim for benefits under the statute, whether the judge's role is judicial or administrative in nature is only one factor in determining if adversity exists under Article III.

At the very least, however, *Libertarian Party*'s portrayal of a New York state judge's firearms licensing decisions as "judicial" signals that we "cannot escape the rule articulated in *Whole Woman's Health*" simply "by labeling an adjudicatory process as an administrative one," as our dissenting colleagues urge. *Reule v. Jackson*, 114 F.4th 360, 366 (5th Cir. 2024).[1]

---

[1] One of our dissenting colleagues argues that "[o]ur decision in *Libertarian Party* was wrong and should be abandoned." *See* Menashi, J., Dissenting Op. at 13. But this decision falls outside both the scope of the Plaintiffs' petition for rehearing in banc, and the scope of the poll that was called. *See* Pet. Reh'g En Banc at 1–3; *cf.* Sullivan, J., Dissenting Op. at 7 n.2. Because *Libertarian Party* is not and has never been the center of this in banc poll, we consider ourselves bound by it. *See United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022).

11

III

The amended panel opinion describes New York's firearms licensing scheme's bifurcated decision-making authority between Upstate judges and specified Downstate executive officials (specifically, county sheriffs or police commissioners). *Kellogg*, 170 F.4th at 29. The Plaintiffs and dissenting colleagues alike identify this bifurcated system as a key point of attack. The system, they say, demonstrates that there is no difference between the roles of Upstate judges and Downstate executive officials and that both roles are therefore administrative rather than judicial.

This view seriously overstates the relevance of New York's bifurcated system. It's easy to see why if one imagines that New York's statutory scheme vested *only* state judges with the authority to review firearms license applications statewide. In that case, there is good reason to think that the dissents' view of Judge Nichols's role would change even though the nature of his job "as adjudicator[], finding facts and determining law in a neutral and impartial judicial fashion" remained the same. *In re Justs. of Sup. Ct. of P.R.*, 695 F.2d 17, 21 (1st Cir. 1982). The fact that executive officials in Downstate New York also issue licenses in addition to performing other enforcement functions is thus immaterial

12

to our assessment of Judge Nichols's role in this case as judicial rather than administrative in nature.

IV

Finally, contrary to the views expressed by one of my colleagues who concurs in the denial to rehear this matter in banc, assessing adversity under Article III does not always pivot on whether a judge oversees a contest of conflicting legal interests. *See* Nathan, *J.*, Concurring Op. at 2–10. To start, a "conflicting-interests approach" conflicts with a long history, dating to Roman law and eventually incorporated into the English common law, of judges performing judicial acts in "non-contentious" proceedings. *See* James E. Pfander & Daniel D. Birk, *Article III Judicial Power, the Adverse-Party Requirement, and Non-Contentious Jurisdiction*, 124 Yale L.J. 1346, 1403–16 (2015). When they drafted Article III's case-or-controversy requirement, the Framers understood that judges had long performed and surely anticipated that they would continue to perform judicial tasks such as appointing guardians, establishing receiverships, and conducting naturalization proceedings.

Early decisions did not suggest that the absence of conflicting legal interests in these non-contentious proceedings affected Article III jurisdiction.

13

Indeed, in an early opinion, Chief Justice Marshall characterized non-contentious naturalization proceedings as judicial acts. *See Spratt v. Spratt*, 29 U.S. 393, 407–08 (1830); *see also* Naturalization Act of 1802, ch. 28, § 1, 2 Stat. 153, 153–54 (conferring on courts the power to decide whether the applicant had demonstrated, among other things, that they were "of good moral character"). Chief Justice Marshall explained that naturalization proceedings compelled judges "to receive testimony, to compare it with the law, and to judge on both law and fact." *Spratt*, 29 U.S. at 408. Adopting a "conflicting-interests approach" would subject state and federal judges to suit even in justiciable non-contentious proceedings when the judge performed an indisputably recognized adjudicative function.

An opinion concurring in the denial of rehearing in banc suggests that some *ex parte* proceedings, such as issuing a search warrant, would satisfy a "conflicting-interests approach" because these proceedings do not remain one-sided for long. Nathan, *J.*, Concurring Op. at 3, 12–14. This is the so-called "possible adversary theory" of adversity, which (unlike the amended panel opinion's focus on judicial function) has barely any jurisprudential support. *See* Pfander & Birk, *supra*, at 1394–96, 1402. The theory in any event fails to explain

14

the many forms of non-contentious court proceedings that are indisputably described as adjudicative.  *Id.* at 1395 "The possible adversary theory has some appeal in that it offers a means of reconciling the adverse-party requirement with the reality of non-contentious practice, but it cannot bear the weight that scholars have placed on it."  *Id.*  "[W]hatever the theory's appeal in the isolated context of certain ex parte proceedings, it is difficult to square with other elements of justiciability doctrine."[2]  *Id.*  Assuming that some non-contentious proceedings may become "two-sided," yet another problem is that hypothetical future adversity is no substitute for the concrete legal interests that Article III requires.  The *prospect* of a future adversary neither sharpens the presentation of legal issues nor reduces the risk of an advisory opinion.

---

[2] Without discrediting the above scholarship on non-contentious proceedings, the same concurring opinion brushes it aside by observing that it pertains only to the scope of Article III jurisdiction, not the adversity requirement.  *See* Nathan, *J.*, Concurring Op. at 15 ("[T]he scholarship Judge Lohier relies upon discusses whether the Article III judicial power grants federal courts the ability to adjudicate *ex parte* proceedings.").  True enough, but the scholarship also confirms that the Framers fashioned Article III's case-or-controversy requirement with non-contentious proceedings firmly in mind.  They decidedly did *not* conceive that judges would simply disrobe in non-contentious proceedings and emerge as mere parties with an institutional stake sufficient to dislodge them from their role as neutral adjudicators.  The laser-focus on the nature of the underlying judicial proceedings that the "conflicting-interests approach" would bring with it to determine adversity has little if any basis in constitutional law and ignores the roots of the judicial role.

## V

I am no fan of restrictions on the scope of Article III jurisdiction or, for that matter, the scope of section 1983 and its application to state judges and other officials. The amended panel opinion is "right" only "in the sense that the law and the Constitution, as we see them, compel the result." *Texas v. Johnson*, 491 U.S. 397, 420–21 (1989) (Kennedy, *J.*, concurring). For these reasons and for the reasons set forth in that opinion, I concur in the decision to deny rehearing in banc.

NATHAN, *Circuit Judge*, concurring in the denial of rehearing *en banc*:

The panel's Article III adversity holding no doubt implicates access to the federal courts to enforce fundamental constitutional guarantees. That warrants our close attention. But *these plaintiffs'* access to the courts to seek vindication of their Second Amendment rights does not depend on how we answer the adversity question. As the panel rightly concludes, federal and state courts offer a variety of other, routine pre-enforcement challenges to New York's firearm licensing scheme. Because of these alternate channels for review, and because I see no clear conflict between the panel's decision and Supreme Court or out-of-circuit precedent, I do not believe the case satisfies "the high standard for rehearing *en banc*" in this Circuit. *Öztürk v. Hyde*, 155 F.4th 187, 206 (2d Cir. 2025) (Nathan, J, concurring in the denial of rehearing *en banc*).

That said, because the Court has seized the occasion of this rehearing petition to publish a variety of views on the Article III question, I write separately to explain that I do share many of Judge Sullivan's reactions to the outcome in this case. I am concerned that access to federal court review of New York's firearms licensing scheme, if available at all, may now depend on whether a prospective plaintiff lives upstate or downstate. *See post* at 7–30 (Sullivan, J., dissenting). I also worry that the decision may create a template for other state legislatures to evade judicial review by assigning administrative functions to judges. And I am troubled by the notion that our Circuit's approach to Article III adversity implies serious jurisdictional defects

1

in some of our and the Supreme Court's seminal cases. These concerns are stark, as there is perhaps no greater task of the federal courts than to provide a forum for the vindication of constitutional rights.

As I have said, as weighty as these concerns are, I do not think they yet warrant *en banc* review because of the availability of other pre-enforcement challenges to safeguard the constitutional rights at issue. Whether, as Judge Sullivan hypothesizes, these pre-enforcement vehicles will leave gaps in the power of the federal courts to remedy constitutional violations is for now too speculative to warrant intervention by the full Court. If he is right, and plaintiffs seeking firearms licenses, or permission from state authorities to engage in other constitutionally protected activity, have no forum to bring their legal challenges to state laws, *en banc* consideration may be warranted.

For now, I lay out the doctrinal reasons—drawn from Supreme Court precedent and historical practice—why I am inclined to conclude that the panel has gone further than necessary in crafting its Article III adversity requirement. Though I do not think the panel's decision rises to the level of a *conflict* with these authorities, I think the panel may have missed an opportunity in this case to clarify the operation of Article III's adversity requirement in a new context. But mere error does not warrant *en banc* review. In applying our rigorous standard for revisiting a panel precedent, and with the expectation that the Article III adversity determination will not affect the constitutional rights of the plaintiffs in this case, I concur in the denial of rehearing *en banc*.

## I

The panel holds that New York state judges serving as licensing

2

officers reviewing firearm applications are insufficiently adverse from plaintiffs challenging New York's firearm licensing criteria to generate a justiciable controversy under Article III. *Kellogg v. Nichols*, 170 F.4th 20, 25 (2d Cir. 2026) (per curiam). In crafting its holding, the panel sets forth a multi-factor approach to determine whether a defendant judge is performing a "judicial function" (or, relatedly, acting "in a judicial capacity"). *Id.* at 27–28 (quotation marks omitted). If so, no Article III jurisdiction. In my view, the better approach is to confine the Article III inquiry in this context to ask only whether a state judge has been sued in connection with the judge's neutrally adjudicating adversarial proceedings—meaning only those in which a judge oversees a contest of conflicting legal interests. Mindful that federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given," *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821), I believe this narrower conflicting-interests approach best comports with Supreme Court precedent as well as historical practice.

**A**

Begin with the basics. The jurisdiction of the lower federal courts extends "to only the kinds of 'Cases' and 'Controversies' listed in Article III." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). For jurisdiction to lie, "there must be an actual controversy over an issue, not a desire for an abstract declaration of the law." *In re Summers*, 325 U.S. 561, 567 (1945). There is thus "no case or controversy between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984) (citing *In re Justices of Sup. Ct.*, 695 F.2d 17, 21 (1st Cir. 1982)). While "private parties" in litigation

3

are usually adverse to each other, judges who "resolve controversies about a law's meaning or its conformance to the Federal and State Constitutions" "generally are not," since they do not "wage battle as contestants in the parties' litigation." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39–40 (2021).

We all agree that, under Article III, a neutral judge adjudicating an adversarial case involving conflicting legal interests is not adverse to a litigant aggrieved by the judge's decisions in the case.[1] But unlike the panel, I would go no further—no multi-factor balancing tests, no "judicial function" inquiries. In my view, this more limited approach is most consistent with Supreme Court precedent and historical practice. Because the panel's result relies heavily on judicial immunity principles to inform the Article III adversity inquiry, I begin with a brief history of both. In full context, the differences between these doctrines are plenty. These differences counsel against conflation of the two doctrines.[2]

---

[1] When I discuss "adversarial" proceedings, I refer to litigation involving conflicting interests, typically when parties assert claims and defenses against one another. When I discuss "adversity," I refer to Article III's limitations on federal jurisdiction.

[2] Judge Menashi observes that "it would be a surprising result if an adjudicator were judicial enough to receive absolute immunity against a litigating applicant yet executive enough to create adversity with the same applicant for the same controversy." *Post* at 2 (Menashi, J., dissenting). As I explain further below, I think the history of these distinct doctrines dampens the surprise. Moreover, at least one type of adverse party—a prosecutor—is commonly absolutely immune from damages actions and yet sufficiently adverse under Article III in an action for prospective relief. *See Anilao v. Spota*, 27 F.4th 855, 863 (2d Cir. 2022).

4

**B**

First, immunity. English law once provided for review of a judge's decision in the form of an action against the judge personally.[3] *See* Feinman & Cohen, *Suing Judges: History and Theory*, 31 S.C. L. Rev. 201, 205 (1980); *see also* Block, Stump v. Sparkman *and the History of Judicial Immunity*, 1980 Duke L.J. 879, 881. This practice lasted until the fourteenth century, when judges began to defend against personal liability by relying on the unassailability of the record of judicial proceedings—a privilege derived from "the royal assertion that the King's word on events that had taken place in his presence was indisputable." Feinman & Cohen, *supra*, at 206; Block, *supra*, at 883; *see also Randall v. Brigham*, 74 U.S. (7 Wall.) 523, 536 (1868). In part on this theory, "[Lord] Coke and his colleagues of the Star Chamber . . . declared the judges of the King's Bench immune from prosecution in competing courts for their judicial acts." *Pulliam*, 466 U.S. at 530 (citing *Floyd v. Barker*, (1607) 77 Eng. Rep. 1305 (KB)). This immunity gradually expanded—first from "the higher judges of the King's courts," to all common-law judges acting within their jurisdiction—and shifted "focus . . . from the need to preserve the King's authority to the public interest in independent judicial decisionmaking." *Id.* at 531. The expansion also "help[ed] to establish appellate procedures as the standard system for correcting judicial error," rather than collateral attacks against judges personally.

---

[3] Though early English law did not provide for an "injunction" against common-law judges, a "parallel is found in the collateral prospective relief available against judges through the use of the King's prerogative writs." *Pulliam*, 466 U.S. at 529.

*Forrester v. White*, 484 U.S. 219, 225 (1988) (citing Block, *supra*).  But even as the immunity to civil damages actions emerged, "the availability of collateral injunctive relief in exceptional cases" remained, as the King's Bench used writs of prohibition to govern the conduct of inferior judges—even those "acting in a judicial capacity[.]"  *Pulliam*, 466 U.S. at 535–36 (discussing *King v. Emerson*, [1913] 2 IR 377 (Ir.)).

American law received the English tradition gradually and unevenly, *see* Feinman & Cohen, *supra*, at 221–22, before settling on absolute immunity for "judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions," *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1871).  The emphasis on the performance of a judicial function as a shield against personal liability—derived from the early privilege of the sovereign's record—grew to take on a practical concern that a judge "compelled to answer in a civil action for his judicial acts" would have "his office be degraded and his usefulness destroyed[.]"  *Id.* at 349.  It is now common to speak of judicial immunity as encouraging judges "to act without fear of suit."  *Stump v. Sparkman*, 435 U.S. 349, 364 (1978); *see also Mireles v. Waco*, 502 U.S. 9, 10 (1991).  "The common law's rationale for these decisions—freeing the judicial process of harassment or intimidation—has been thought to require absolute immunity even for advocates and witnesses."  *Forrester*, 484 U.S. at 226.

Unlike the medieval origins of judicial immunity, Article III's justiciability requirements were in part a rejection of the English model of adjudication, in which advisory opinions—declarations of a

policy's legality untethered from any real dispute—were common. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 297 (2021) (Roberts, C.J., dissenting) (citing Fallon et al., Hart & Wechsler's The Federal Courts and the Federal System 52 (7th ed. 2015)).  The rule that "the judicial power" permits only the resolution of "actual controversies arising between adverse litigants," rather than shielding judges from intimidation or collateral attack, reflects the Constitution's allocation of legislative and adjudicative powers.  *See Muskrat v. United States*, 219 U.S. 346, 361 (1911); *see also Whole Woman's Health*, 595 U.S. at 51 (citing 4 Papers of John Marshall 95 (Cullen ed. 1984)).

Fifty years ago, our Circuit affirmed the dismissal of an action against Justice Heller of the Supreme Court of New York challenging the constitutionality of New York's two-year residency requirement for obtaining a divorce.  *Mendez v. Heller*, 530 F.2d 457, 458, 461 (2d Cir. 1976).  The plaintiff did not seek damages against Justice Heller, so judicial immunity was not at issue.  Instead, the question was whether the plaintiff could sue Justice Heller for prospective relief from the residency rule—a jurisdictional prerequisite to filing for divorce in New York.  *See id.* at 458.  Agreeing with the district court, we explained that no action lay against Justice Heller for how he would eventually rule on the divorce complaint itself, since in that capacity he would be "an entirely disinterested judicial officer and not in any sense the posture of an adversary to the contentions made on either side of the case."  *Id.* at 459 (quotation marks omitted).  Nor could the plaintiff sue Justice Heller "as the administrative superior of the defendant Clerk," "who initially screen[ed] divorce complaints for compliance with" the residency requirement.  *Id.*  Whatever way

7

the plaintiff tried to "bifurcate[]" Justice Heller's role, we held that the action was not a "Case" or "Controversy" under Article III because "a court's investigation of its jurisdiction is eminently a judicial function." *Id.* at 460. However, a clerk's duties will not always come within that category, we explained, such as when the clerk performs "the traditionally administrative task of fee collection[.]" *Id.* (citing *Boddie v. Connecticut*, 286 F. Supp. 968 (D. Conn. 1968)).

Six years later, the First Circuit considered a mandamus petition brought by the Justices of the Supreme Court of Puerto Rico that sought the dismissal of litigation against the Justices challenging the constitutionality of Puerto Rico's bar dues requirement. *In re Justices*, 695 F.2d at 18. After the bar association filed disciplinary complaints against the plaintiffs, the Commonwealth Supreme Court upheld the bar membership requirement and suspended the plaintiffs from the practice of law for nonpayment. *Id.* at 19. Then, in federal court, the plaintiffs brought "conventional prospective attacks on the constitutionality of the Commonwealth statutes, seeking traditional injunctive and declaratory relief." *Id.* at 19–20. Like this Circuit did in *Mendez*, the First Circuit held that "the role of the Justices with respect to these statutes is adjudicative": Under the scheme, bar officials could "bring a complaint based on nonpayment of dues before the Puerto Rico Supreme Court." *Id.* at 21. "In deciding cases based on such complaints, the Justices act[ed] as they would in any other case based upon a Commonwealth statute: they [sat] as adjudicators, finding facts and determining law in a neutral and impartial judicial fashion." *Id.* This meant no Article III adversity, since "at least ordinarily, no 'case or controversy' exists between a

8

judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *Id.* Instead, "[j]udges sit as arbiters without a personal or institutional stake on either side of the constitutional controversy." *Id.* But the First Circuit held out other contexts in which seeking prospective relief from judges may be permissible, such as "to ensure full relief to the parties," or when judges "exercise . . . disciplinary power" over members of the bar, rather than merely ruling on complaints. *See id.* at 23–24.

*Mendez* and *In re Justices* both concerned claims asserted against judges who oversaw adversarial litigation involving conflicting interests—the adjudication of divorce petitions and disciplinary complaints. The Supreme Court case *Pulliam* involved another: a magistrate judge's alleged "practice of imposing bail on persons arrested for nonjailable offenses[.]" 466 U.S. at 524–25. There, the Supreme Court held that judicial immunity does not bar the award of prospective injunctive relief against judges even when acting in a judicial capacity. *See id.* at 536–37. As a matter of history, the Supreme Court explained that "[n]one of the seminal opinions on judicial immunity, either in England or in this country, has involved immunity from injunctive relief." *Id.* And as for practical concerns, "there is no evidence that the absence of that immunity has had a chilling effect on judicial independence." *Id.* at 536. In sum, "injunctive relief against a judge raises concerns different from those addressed by the protection of judges from damages awards." *Id.* at 537. But the Supreme Court also admonished that its rule was not without limitations, including the principle that there is "no case or controversy between a judge who adjudicates claims under a statute

9

and a litigant who attacks the constitutionality of the statute." *Id.* at 538 n.18 (citing *In re Justices*, 695 F.2d at 21).

*Pulliam*'s citation to *In re Justices* was all we had from the Supreme Court on the question until *Whole Woman's Health*. That case arose from claims for prospective relief asserted against a judge and court clerk tasked by Texas state law with adjudicating statutory claims for performing or abetting abortions. 595 U.S. at 35–37. Because the law purported to prohibit enforcement by state officials, the plaintiffs sought to enjoin judges and clerks from hearing cases under the law. *Id.* at 36–37. The Supreme Court rejected the attempt, in part under Article III's adversity requirement, explaining that judges and clerks do not "participate as adversaries in [private parties'] disputes," nor do they "wage battle as contestants in the parties' litigation." *Id.* at 40. Quoting *Pulliam*, the Supreme Court explained, "no case or controversy exists between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *Id.* (quotation marks omitted).

## C

With this context in mind, I am hesitant to accept the panel's ahistorical view that the "Court's rationale for recognizing . . . decisions as judicial rather than administrative for purposes of judicial immunity in *Libertarian Party* applies equally for purposes of determining jurisdiction."[4] *Kellogg*, 170 F.4th at 28 (citing

---

[4] The panel qualifies this conclusion in a footnote, explaining that it does "not suggest that our conclusion in *Libertarian Party* that judges ruling on licensure applications are entitled to judicial immunity because their decisions are *judicial* rather than administrative is binding with respect to

10

*Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 125 (2d Cir. 2020)). Even assuming that *Libertarian Party* got the immunity question right,[5] the doctrines have markedly different origins and motivations: judicial immunity, at first to enforce the authority and finality of a judicial record, and later to grant judges independence from the fear of civil liability; and adversity, to limit the federal courts to resolving justiciable controversies. As the Supreme Court recognized in *Pulliam*, prospective relief against judges was available in English courts through prohibitive writs, and centuries of evidence did not suggest that enjoining judges created fears of improper motivation in the way damages actions could. *See* 466 U.S. at 536–37. Of course, there are other limitations on this form of relief, such as the requirement that a plaintiff demonstrate equitable entitlement, *id.* at 538 n.18, and the related sovereign immunity limitation on issuing injunctions against courts that merely "work to resolve disputes

our Article III adversity analysis here." *Kellogg,* 170 F.4th at 28 n.5. I do not know how that can be true if the "rationale for recognizing such decisions as judicial rather than administrative for purposes of determining judicial immunity" "applies equally" to the Article III context. *Id.* at 28.

[5] Judges may receive qualified immunity from liability arising from their performance of non-judicial acts, on the theory that they are acting in an administrative capacity. *See Forrester*, 484 U.S. at 230. Only two members of this Court consider *Libertarian Party*'s judicial immunity holding worthy of *en banc* review, *see post* at 2 (Menashi, J., joined by Park, J., dissenting), and so I confine my analysis to Article III adversity. But in analyzing the latter, I do not think us obligated to begin from the premise that upstate licensing officers are entitled to judicial immunity and then work backward to adversity. In any event, the doctrines are distinct; when they produce similar answers, the result is incidental rather than by design.

between parties," *Whole Woman's Health*, 595 U.S. at 39; *see also Dalton Adding Mach. Co. v. State Corp. Comm'n*, 236 U.S. 699, 700–01 (1915) (summarizing many of these limitations in the licensing context). But as far as Article III adversity is concerned, I do not read precedent or practice to say anything more than that the federal courts lack jurisdiction to hear claims against judges arising from a judge's adjudicating an adversarial proceeding involving conflicting legal interests. After all, "[f]or the most part, injunctive relief against a judge raises concerns different from those addressed by the protection of judges from damages awards." *Pulliam*, 466 U.S. at 537.

The panel starts from a similar premise, explaining that, "[m]ost obviously, a judge acts in an adjudicatory capacity when the judge resolves disputes between adverse parties." *Kellogg*, 170 F.4th at 27. That rule flows directly from *Mendez*, *In re Justices*, *Pulliam*, and *Whole Woman's Health*. So far, so good. But the panel purports to go further, stripping Article III jurisdiction over claims for prospective relief against judges for actions taken "in various non-adversarial contexts," in other words, when the judge "decides whether single-party applications satisfy relevant legal requirements[.]" *Id.* at 28. To make the jump, the panel creates a multi-factor test drawn from other circuits to measure whether the judge "has acted in a judicial capacity in adjudicating a state statutory claim that is then challenged on constitutional grounds." *Id.*

The panel is right to ensure that its non-adversity holding covers judges who do no more than rule on single-party applications like "authorizing search or arrest warrants" or "the interception of

12

electronic communications." *See id.*[6] (I would add to this list other types of *ex parte* proceedings, like a judge's initial screening of a complaint or ruling on a motion for a default judgment.) But we need no new rule to reach these situations, because these *ex parte* applications arise in the course of *adversarial* proceedings. Though

---

[6] It is not clear to me that the panel's third example, when a judge "rul[es] on attorney-licensure applications," fits the same mold. *Cf. Kellogg*, 170 F.4th at 28. For this, the panel cites *District of Columbia Court of Appeals v. Feldman*, in which the Supreme Court held that attorney-licensure proceedings in the District of Columbia Court of Appeals were "judicial," such that review of the proceedings was required to be taken in the Supreme Court, rather than a lower federal court, under what would later be called the *Rooker-Feldman* doctrine. *See* 460 U.S. 462, 476 (1983) (citing *Rooker v. Fid. Tr. Co.*, 263 U.S. 413, 415, 416 (1923)). Much like whether a judge's act is "judicial" for immunity purposes, the *Rooker-Feldman* "judicial in nature" inquiry does not automatically graft onto Article III's adversity requirement. *See Gras v. Stevens*, 415 F. Supp. 1148, 1151 (S.D.N.Y. 1976) (distinguishing a challenge to a judge's adjudicating a divorce application, which was nonjusticiable under Article III, from "[c]ases sustaining actions against Justices of the Appellate Division . . . concerning rules for admission to the bar prescribed by them"). As Judge Friendly explained in the context of bar eligibility determinations, "it would seem anomalous that while federal courts could entertain a complaint similar to the plaintiffs' if made with respect to other licensed professions, such as medicine or accountancy, they are powerless with respect to admission to the bar. The grant of injunctive relief in a case like this would not have the in terrorem effect on state judges that the threat of a subsequent damage action would have[.]" *Law Students C.R. Rsch. Council, Inc. v. Wadmond*, 299 F. Supp. 117, 123 (S.D.N.Y. 1969)); *see also Gras*, 415 F. Supp. at 1151 (distinguishing *Wadmond*); *Summers*, 325 U.S. at 562–73 & n.2 (reviewing a bar eligibility determination made by the Justices of the Supreme Court of Illinois after the Justices appeared to defend the determination).

search warrants and interception applications typically involve only one party at the time they are issued, they place in legal jeopardy the legal interests of an absent party who one day may appear to oppose the applicant. Indeed, we have said as much in our immunity cases, explaining that *ex parte* orders like "issuing a search warrant" and "granting a petition for sterilization" are "acts arising out of, or related to, individual *cases* before the judge[.]" *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009) (emphasis added). Contrast that with an official's reviewing applications for licenses and permits to engage in some activity out in the world—like buying a firearm, getting married, or hosting a parade—in which the official represents only the state's interest in considering the applications. In such instances, no present or potential adversary's conflicting legal interests are at play: it is *regulator v. applicant*.

In other words, if a judge merely oversees a contest of legal interests—even if the contest does not at every stage of the proceeding involve two present parties—I would conclude that the judge adjudicates an adversarial proceeding for Article III purposes without asking whether the judge has performed a "judicial function" or acted in a "judicial capacity." *See, e.g.*, *Allen v. DeBello*, 861 F.3d 433, 442 (3d Cir. 2017) (judges ruling on *ex parte* applications for temporary restraining orders in child custody disputes); *Lindke v. Tomlinson*, 31 F.4th 487, 492–94 (6th Cir. 2022) (similar). To borrow from the sovereign immunity context, federal courts lack the power to enjoin state courts that "work to resolve disputes between parties," or the "machinery" of those courts. *Whole Woman's Health*, 595 U.S. at 39 (quoting *Ex parte Young*, 209 U.S. 123, 163 (1908)). Because *ex parte*

14

proceedings involving a contest of legal interests are part of a state court's dispute-resolution "machinery," they are a type of adversarial adjudication that cannot give rise to a subsequent suit against judges who oversee them. On the other hand, I would conclude that a judge who has been recruited by a state statutory scheme to decide applications that do not concern the concrete legal interests of another party is not operating the "machinery" of the state court, but instead serving as an administrative official amenable under Article III to suit by an aggrieved applicant. *See, e.g.*, *Hadnott v. Amos*, 394 U.S. 358, 360–63 & n.2 (1969) (state probate judge responsible for preparing election ballots upon receiving notice of nominations). In this context, the judge has effectively stepped in to defend the state's interests in lieu of an adversarial party—a hallmark of administrative action traditionally subject to judicial review.

Judge Lohier's concurrence in the denial of rehearing pushes back on this explanation, arguing that "the so-called 'possible adversary theory' of adversity . . . has barely any jurisprudential support." *Ante* at 15 (Lohier, J., concurring) (citing Pfander & Birk, *Article III Judicial Power, the Adverse-Party Requirement, and Non-Contentious Jurisdiction*, 124 Yale L.J. 1346, 1394–96, 1402 (2015)). The argument is drawn from scholarship that concerns a wholly different issue: the basis for federal courts' jurisdiction over "non-contentious" proceedings like single-party applications for search warrants. In other words, the scholarship Judge Lohier relies upon discusses whether the Article III judicial power grants federal courts the ability to adjudicate *ex parte* proceedings. And his concern that "[t]he *prospect* of a future adversary neither sharpens the presentation of

15

legal issues nor reduces the risk of an advisory opinion," cf. *id* at 16, goes to whether a federal *ex parte* proceeding is sufficiently adverse to constitute a "Case" or "Controversy" under Article III, not whether a potential future adversary generates conflicting interests in an earlier proceeding. (Tellingly, neither sharp presentation of issues nor the risk of an advisory opinion are factors the panel opinion's test would have courts consider.)

In contrast to the issue discussed in the scholarship cited by Judge Lohier, this case, which of course is not an *ex parte* proceeding, instead requires that we determine what types of *underlying* proceedings may give rise to a subsequent action against judges who oversee them. As I've described, the precedents relevant to that question turn on whether the underlying proceeding involved a contest of conflicting interests. The distinct historical questions raised in Judge Lohier's concurrence are simply not relevant to the adversity debate at issue here.

**D**

Confining the Article III inquiry in this way has at least two other benefits. It harmonizes our treatment of judges and administrators (making the inquiry truly "functional," *cf. Kellogg*, 170 F.4th at 25) and avoids the analytical difficulties of defining a "judicial function" in this context.

First, this approach ensures that judges who are assigned administrative functions under state law are treated the same as other public officials who do similar work. It has long been uncontroversial for administrators tasked with granting or denying licenses under statutory criteria to defend those criteria (or lack thereof) against

16

claims for prospective relief.[7] This makes sense; the consideration of a license application under state law is distinctly administrative, even when "executive officers . . . act judicially in the determination of facts in the performance of their official duties[.]" *Reetz v. Michigan*, 188 U.S. 505, 507 (1903) (quoting *People v. Hasbrouck*, 39 P. 918, 921 (Utah 1895)) (collecting examples). Indeed, the Administrative Procedure Act provides for judicial review of federal agency licensing, among other types of agency orders. *See* 5 U.S.C. §§ 551(6), (7), (9), (13), 704; *see also Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 670 (2025) ("The licensing proceeding culminates with a final order by the Commission that either grants or denies the license. The final orders of the Commission are subject to judicial review . . . in a court of appeals."). Those actions are maintained against the licensing agency itself. In my view, the same rule should apply whether licensing officials, under state law, are "called a court or a board of registration[.]" *Reetz*, 188 U.S. at 507.[8] Though the disparity between

---

[7] *See, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 653 (2015) (marriage licenses); *Baldwin v. Fish & Game Comm. of Mont.*, 436 U.S. 371, 372–73 (1978) (hunting licenses); *Highland Farms Dairy v. Agnew*, 300 U.S. 608, 616–17 (1937) (milk sales licenses); *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 318–20 (2002) (public assembly licenses); *Corp. Comm. of Okla. v. Lowe*, 281 U.S. 431, 432–39 (1930) (competitor's challenge to granting of a public utility license).

[8] Judge Lohier's response, that there exists "a long history . . . of judges performing judicial acts in 'non-contentious' proceedings," *ante* at 13 (Lohier, J., concurring), simply begs the question. Our disagreement is not whether Judge Nichols performed a judicial function, but whether the performance of a judicial function in an earlier proceeding is dispositive of Article III adversity in a later one. And on that score, there *is* a long history of the Supreme Court and the lower courts—from *Mendez* to *Whole Women's*

17

upstate and downstate plaintiffs demonstrates the theoretical problems posed by the panel's opinion, the conflicting-interests approach would not produce a different outcome even if "New York's statutory scheme vested *only* state judges with the authority to review firearm license applications statewide." C*f. ante* at 12 (Lohier, J., concurring).

The second advantage of this approach is that it does not turn on the slippery concept of a "judicial function." *Cf. Kellogg*, 170 F.4th at 27 (quotation marks omitted). We use that term often, across a variety of contexts and to advance a variety of doctrinal goals: to define the scope of judicial immunity, *see Oliva v. Heller*, 839 F.2d 37, 39–40 (2d Cir. 1988); to explain which types of state-court proceedings may be reviewed in federal district court, *see D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 473 (1983); and to determine whether a right of public access attaches to a judicial document, *see Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019). Judge Lohier's concurrence from the denial of rehearing identifies yet another: deciding whether to accord *res judicata* (or preclusive) effect to a naturalization determination. *See ante* at 14 (Lohier, J., concurring) (citing *Spratt v. Spratt*, 29 U.S. (4 Pet.) 393, 407–08 (1830)). Each test comes with its own factors, case-by-case inquiries, doctrinal purposes, and constitutional interests. As I have explained with respect to judicial immunity, these considerations may be different from those governing whether a defendant is

---

*Health*—using the presence of conflicting legal interests, rather than a multi-factor "judicial function" test, to guide the inquiry. In fact, analogies to other "judicial function" tests are notably absent from the Article III adversity cases—until this one.

sufficiently adverse under Article III. Likewise, contrary to Judge Lohier's invocation of Chief Justice Marshall's discussion of "judicial function" in *Spratt*, I do not think the scope of *res judicata*—which can apply even to administrative determinations, made "in a judicial capacity," *see Univ. of Tenn. v. Elliott*, 478 U.S. 788, 797 (1986)—is dispositive of our Article III analysis. All that these cases demonstrate, if anything, is that while the Supreme Court has ample cases available to define "judicial function," it has not relied on any of them in crafting the Article III adversity requirement. To me, it makes more sense to turn to what the Supreme Court *has said* on adversity (as scant as it may be), as well as historical practice, to define the scope of the jurisdictional inquiry.

To illustrate both of the previous points, look no further than the six factors the panel offers to determine whether a state official has performed a judicial function and is thus insufficiently adverse under Article III: (1) "whether the judge may initiate proceedings under the statute," (2) "whether the judge who has issued the order is responsible for enforcing it," (3) "whether the judge played a role in enacting the statute pursuant to which the order was issued," (4) whether the judge is adequately alleged to have a personal or institutional stake in upholding the statute," (5) whether the challenged act is a traditionally administrative task, or ministerial task, like fee collection," and (6) "whether the challenged statutory scheme allows for traditional judicial safeguards." *Kellogg*, 170 F.4th at 28 (quotation marks and citations omitted).

Many of these factors will weigh against Article III jurisdiction in purely administrative cases. For example, an executive official

19

tasked with approving marriage or medical license applications will often not initiate proceedings, be responsible for punishing anyone for failing to use a license, or have played any personal role in the enactment of the licensing scheme. That is three points against judicial review. Nor would assigning the role to a state judge somehow diminish the official's interest in upholding the statute, make the task less ministerial, or increase the number of judicial safeguards. Yet in the latter context, there are already at least three factors that weigh against Article III adversity, and another three up in the air. The panel's balancing test, which seeks to assess a defendant's function rather than role, may often tilt the scale against judicial review when the defendant is a state judge. I would stick instead to a simpler conflicting-interests approach drawn from Supreme Court adversity precedent and historical practice.

## II

In this case, Judge Nichols did not oversee an adversarial proceeding in which different parties contested Plaintiffs' entitlement to firearms licenses. Instead, Judge Nichols received the applications, considered other background material, and denied the applications under New York's statutory criteria. You might expect the same to happen in an agency deciding whether to permit a corporation to open a power plant; in a medical board deliberating about whether to license a would-be physician or treatment; in a county clerk's office where couples apply to get married; or in a downstate licensing officer's office considering the very same firearm applications as the ones at issue here. In all of those situations, Article III's adversity requirement would not prevent a plaintiff from seeking review of the

20

statutory schemes underlying those decisions in federal court. A legislature's choice to assign the same task to a state judge should not require the consideration of a complicated multi-factor balancing test, much less put a thumb on the scale against open courthouse doors and judicial review.

I would hold that Supreme Court precedent and historical practice limit the Article III non-adversity inquiry in this context to judges adjudicating adversarial proceedings involving conflicting legal interests. Were this case the only method for plaintiffs to challenge the New York statutes at issue, getting the question right would be of exceptional importance. But because "many paths exist to vindicate the supremacy of federal law in this area," *Whole Woman's Health*, 595 U.S. at 48, I concur in the denial of rehearing *en banc*.

RICHARD J. SULLIVAN, *Circuit Judge*, joined by LIVINGSTON, *Chief Judge*, BIANCO, PARK, NARDINI, and MENASHI, *Circuit Judges*, dissenting from the denial of rehearing en banc:

Two upstate New Yorkers – a member of the Army National Guard and another who is licensed as a security guard – seek judicial review in federal court following the State of New York's refusal to issue them handgun licenses. Rather than address the merits of those claims, a panel of our Court held that no Article III case or controversy exists between upstate New Yorkers who are denied handgun licenses and the state officials who are responsible for those denials. According to the panel, the State's refusal to grant a handgun license to an upstate applicant does not create any adversity between the applicant and the official who denied the license. Why? Because under New York law, the only officials who may consider handgun-license applications filed by upstate residents like the plaintiffs here are local judges.

That conclusion is as wrong as it sounds. For starters, the panel's decision implies serious jurisdictional defects in at least four of our Circuit's leading precedents – not to mention the Supreme Court's landmark Second Amendment decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) – each of which considered challenges to New York's licensing regime in cases brought against upstate judges acting as licensing officers. More fundamentally, the panel

fails to recognize that when upstate judges serve as the State's handgun-licensing

officers, they act as the functional equivalents of executive licensing officials – not

as neutral arbiters. In doing so, the panel significantly narrows the rights of

upstate New Yorkers to challenge handgun-license denials in federal court while

allowing virtually identical challenges by downstate residents for whom the

State's licensing officers are law-enforcement officials. The panel's decision also

serves as a blueprint for states to insulate licensing decisions in other areas

affecting constitutional interests – such as marriage licenses or parade permits –

from federal-court scrutiny by vesting authority to make such determinations in

local judges.

Our Court should have reconsidered en banc the panel's Article III holding.

Instead, we "needlessly bar plaintiffs with justiciable claims from having their day

in court." *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 45 (2d Cir. 2023) (en banc).

For these reasons, and those set forth below, I respectfully dissent.

## I.    Background

New York is one of a small handful of states that makes possession of a

handgun a felony by default. *See, e.g.*, N.Y. Penal Law § 265.01-b. State law carves

out an exception for those who hold a valid license issued under section 400.00 of

the Penal Law. *See id.* § 265.20(a)(3). To obtain such a license, a would-be gun owner must apply to the statutorily designated "licensing officer" for his city or county of residence. *Id.* § 400.00(3)(a). The Penal Law identifies three categories of licensing officers: judges and justices (for applications filed by residents of New York's upstate counties), sheriffs and police commissioners (for applications filed by residents of most downstate counties), and the superintendent of state police (for applications filed by retired members of the division of state police). *Id.* § 265.00(10).[1] The licensing officer is responsible for determining that each statutory eligibility requirement is satisfied, including the requirement that the applicant be of "good moral character." *Id.* § 400.00(1)(b). To that end, the statute grants licensing officers broad discretion to require applicants to provide, as a condition of obtaining a license, "such other information . . . that is reasonably

---

[1] In full, the relevant definition provides:

> "Licensing officer" means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01 of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance.

N.Y. Penal Law § 265.00(10). For simplicity, I will refer to counties in which the designated licensing officer is a judge or justice as "upstate" counties and counties in which the licensing officer is a law-enforcement official as "downstate" counties.

3

necessary and related to the review of the licensing application."  *Id.* § 400.00(1)(o)(v).  And by statute, "[n]o license shall be issued or renewed pursuant to [section 400.00] except by the licensing officer."  *Id.* § 400.00(1).

Plaintiffs Jeremy Kellogg and Jonathan Harmon are two residents of Columbia County, New York, who seek to exercise their constitutional rights to purchase, possess, and carry handguns for self-defense.  App'x at 6, 19, 21.  To that end, Kellogg and Harmon submitted their handgun-license applications to Jonathan C. Nichols, a designated licensing officer for Columbia County who is also a judge of the Columbia County Court.  *Id.* at 6, 19, 22.  After considering the information that Kellogg and Harmon provided in support of their respective applications, Nichols denied both applications on the ground that each of them lacked good moral character.  *Id.* at 20–23.

Kellogg and Harmon then filed this federal action under 42 U.S.C. § 1983, alleging that Nichols's denial of their applications, together with the statutory provisions that the denials were based on, violated the Second and Fourteenth Amendments.  App'x at 26–27.  The two plaintiffs seek declaratory and injunctive relief against Nichols in his "capacity as a statutory firearm[-]licensing officer pursuant to Penal Law § 265.00(10)," *id.* at 7, and nominal damages from Nichols

4

in his individual capacity, *id.* at 29. Kellogg and Harmon specifically challenge section 400.00(1)'s good-moral-character requirement and its catchall disclosure provision. *Id.* at 28; *see* N.Y. Penal Law § 400.00(1)(b) (requiring applicants to be "of good moral character"); *id.* § 400.00 (1)(o)(v) (requiring applicants to provide "such other information required by the licensing officer that is reasonably necessary and related to the review of the licensing application"). They also challenge various New York criminal statutes making it illegal to possess a firearm without a license. App'x at 28; *see* N.Y. Penal Law §§ 265.01, 265.02(5)(i), 265.03(2)–(3), 265.04(2).

The district court dismissed Kellogg and Harmon's complaint in full. App'x at 44. With respect to their individual-capacity claims, the district court held that Nichols was entitled to absolute judicial immunity under our Circuit's decision in *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106 (2d Cir. 2020). App'x at 35–38. The district court further concluded that it lacked subject-matter jurisdiction to consider Kellogg and Harmon's official-capacity claims under the principle that "'no case or controversy' exists 'between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute.'" *Id.* at 41 (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 40 (2021)).

5

Through an amended opinion, the panel affirmed for substantially the same reasons as the district court. Specifically, the panel agreed that Kellogg and Harmon's individual-capacity claims were barred by *Libertarian Party* and that "there is no live case or controversy between New York state court judges serving as firearms[-]licensing officers and litigants challenging the State's licensing scheme." Am. Op. at 14. Upstate New York judges acting as licensing officers and unsuccessful license applicants, the panel explained, "are decidedly not parties having adverse legal interests" because such licensing officers merely "adjudicate the merits of the applications submitted to them" and have "no independent enforcement authority or role in criminal prosecutions to enforce the [licensing] statute." *Id.* at 17 (internal quotation marks omitted). That conclusion might be different, the panel suggested, for suits brought against *downstate* licensing officers (*i.e.*, sheriffs and police commissioners) because those officials also have the power to make arrests for unlicensed handgun possession. *See id.* at 26.

Kellogg and Harmon timely petitioned for rehearing en banc. *See* Fed. R. App. P. 40.

## II.    Discussion

I do not object to the panel's holding that *Libertarian Party* entitles Nichols to absolute immunity with respect to Kellogg and Harmon's individual-capacity claims.[2]   And I agree that Nichols is not a proper defendant as to their pre-enforcement challenges to New York's *criminal* laws against unlicensed firearm possession.  *See* N.Y. Penal Law §§ 265.01, 265.02(5)(i), 265.03(2)–(3), 265.04(2).  But I cannot accept the panel's conclusion that "there is no live case or controversy between New York state court judges serving as firearms[-]licensing officers and litigants challenging the State's licensing scheme."  Am. Op. at 14.

### A. The Panel's Decision Implies Serious Jurisdictional Defects in Several Second Circuit and Supreme Court Decisions Interpreting the Second Amendment.

The panel's Article III holding undermines the jurisdictional foundation of several of our Circuit's and the Supreme Court's major Second Amendment precedents, which treated official-capacity claims against upstate judges serving as licensing officers under New York's handgun-licensing scheme as justiciable.

---

[2] Judge Menashi would take this opportunity to overturn *Libertarian Party* altogether.  *Post* at 13 (Menashi, *J.*, dissenting).  But while there may be good reason to question the wisdom of *Libertarian Party*, petitioners never asked the full court to consider such a review, focusing exclusively on the issue of whether upstate applicants for firearms licenses are adverse to the judges who denied their applications.  *See* Pet. Reh'g En Banc at 1–3.  I therefore limit my dissent to that issue.

Those cases include the Supreme Court's landmark decision in *Bruen*, 597 U.S. at 1 (exercising jurisdiction over claims against Justice Richard J. McNally, Jr. of the New York Supreme Court), as well as our Court's decisions in *Antonyuk v. James*, 120 F.4th 941, 941 (2d Cir. 2024) (exercising jurisdiction over claims against Judge Matthew J. Doran of the Onondaga County Court), *Libertarian Party*, 970 F.3d 106, 106 (exercising jurisdiction over claims against Justice M. William Boller of the New York Supreme Court and Judge Dennis M. Kehoe of the Wayne County Court), and *Kachalsky v. County of Westchester*, 701 F.3d 81, 84 (2d Cir. 2012) (exercising jurisdiction over claims against Justice Jeffrey A. Cohen, Justice Albert Lorenzo, and Justice Robert K. Holdman of the New York Supreme Court and Judge Susan Cacace of the Westchester County Court).

In each of these cases, the court resolved the merits of constitutional challenges to aspects of New York's licensing scheme by adjudicating claims brought against upstate judges in their official capacities as licensing officers. In *Bruen*, the Supreme Court held that Justice McNally violated the Second Amendment in denying the plaintiffs' license applications based on New York's then-existing "proper cause" standard. 597 U.S. at 15–17, 71. In *Antonyuk*, we affirmed a preliminary injunction that restrained Judge Doran from requiring

applicants to disclose their social-media accounts under section 400.00(1)(o)(iv). 120 F.4th at 958, 1002–04, 1048. And in *Libertarian Party*, the *only* defendant whose conduct we found gave rise to a justiciable case was Judge Kehoe, so that our merits disposition in that case upholding New York's good-moral-character and proper-cause requirements necessarily depended on the existence of a case or controversy between the relevant plaintiff and the upstate judge who rejected his license application. 970 F.3d at 122, 125. Similarly, in *Kachalsky*, we affirmed the district court's on-the-merits grant of summary judgment in favor of Judge Cacace, Justice Cohen, Justice Lorenzo, and Justice Holdman on the plaintiffs' claims that those judges unconstitutionally denied their license applications. 701 F.3d at 101.

To be sure, these cases did not address the precise jurisdictional question presented here – none of the defendants there even thought to argue that upstate licensing officers were not adverse to unsuccessful license applicants. But *all* federal courts – including the Supreme Court – have an "independent obligation to ensure that they do not exceed the scope of their jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). And the panel's holding unmistakably implies that *Bruen* and our Circuit precedents violated Article III by

9

resolving the merits of Second Amendment claims brought against New York judges in their capacities as licensing officers.

If the panel is correct that there is no adversity between upstate licensing officers and unsuccessful license applicants, then no federal court would have had the power to award relief against Justice McNally in *Bruen*. Indeed, if, notwithstanding the Supreme Court's opinion holding New York's proper-cause requirement unconstitutional, Justice McNally had continued to deny handgun licenses based on that requirement, the panel's Article III holding would mean that no federal court would have had the power to enjoin him from doing so.

The panel's decision also means that Judge Doran, the upstate licensing officer sued in *Antonyuk*, would be free to continue requiring applicants to disclose their social-media accounts notwithstanding our decision preliminarily striking down that provision. Since, under the panel's logic, upstate judges who serve as licensing officers and unsuccessful license applicants are not adverse to each other, no federal court would have the power to require Judge Doran to accept license applications that fail to list the applicant's social-media accounts. The panel's decision therefore raises serious questions regarding the federal courts' ability to

enter complete relief in cases challenging the criteria to obtain a New York handgun license.

## B. Upstate New York Judges Who Serve as Licensing Officers Are Adverse to Unsuccessful License Applicants.

Article III limits federal courts to resolving "Cases" and "Controversies." U.S. Const. Art. III, § 2. In addition to the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), Article III's case-or-controversy requirement demands genuine adversity between two or more opposing parties – that is, the dispute must "touch[] the legal relations of parties having adverse legal interests," *In Matter of Motors Liquidation Co.*, 829 F.3d 135, 168 (2d Cir. 2016) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)). "Although adverseness is an abstract concept that defies straightforward definition, typical adverseness is easy enough to describe: [i]t is where one party 'asserts its right' and the other party 'is resisting.'" *Nat'l Lab. Rels. Bd. v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 400 (4th Cir. 2022) (quoting *Old Colony Tr. Co. v. Comm'r Internal Revenue*, 279 U.S. 716, 724 (1929)). "Classic adverseness," in other words, is simply "the push and pull of parties with opposing interests who offer disagreements to the court." *Id.* In addition, a contemplated award of judicial relief must have "real meaning" in the form of tangible, real-world

11

consequences for the parties. *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 939 (1983) (internal quotation marks omitted).

Under these bedrock principles, license-denial suits like this one are obvious candidates for Article III adjudication. *See Parker v. District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007) (explaining that courts have "consistently treated a license or permit denial pursuant to a state or federal administrative scheme" as giving rise to a justiciable case or controversy); *see, e.g.*, *Bruen*, 597 U.S. at 15–17; *Libertarian Party*, 970 F.3d at 122, 125. New York's refusal, through one of its statutorily designated licensing officials, to issue a handgun license presents a quintessential clash of opposing legal interests:  the applicant asserts a constitutional right to a firearm, whereas the licensing official asserts the State's interest, rooted in its traditional police powers, in regulating the proliferation of dangerous weapons. Without a license, the applicant cannot exercise his asserted right to possess a handgun, both because doing so would expose the applicant to a risk of criminal prosecution, *see, e.g.*, N.Y. Penal Law § 265.01-b, and because without a license, no legitimate firearms dealer will sell a handgun to the applicant in the first place, *see id.* § 400.00(12). And finally, a declaration or an injunction striking down the statutory criteria that the licensing official relied on to deny the license would

12

meaningfully redress the applicant's injury "by removing the allegedly unconstitutional barrier . . . between [the applicant] and the requested [license]." *Gutierrez v. Saenz*, 606 U.S. 305, 319 (2025).

Nevertheless, because New York's administrative handgun-licensing scheme selects judges as its upstate gatekeepers, the panel held that a refusal by one of those judges to issue a license does not create any adversity between the judge and the unsuccessful applicant. *See* Am. Op. at 14. That surprising conclusion rested entirely on the principle that, "[i]n general, 'no case or controversy' exists 'between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute.'" *Id.* at 12 (quoting *Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984)).[3] In holding that this general principle of judge–litigant non-adversity bars license-denial suits against upstate New York judges, the panel relied on two prior cases that found an absence of a federal case or controversy between a litigant and a judge – the Supreme Court's decision in *Whole Woman's Health*, 595 U.S. 30, and our Circuit's decision in *Mendez v. Heller*,

---

[3] The panel does not appear to question Kellogg and Harmon's Article III standing to challenge the denials of their licenses and the statutory provisions that those denials were based on. In *Libertarian Party*, we expressly held that two unsuccessful upstate license applicants had standing to seek relief against the judges who denied their applications based on allegedly unconstitutional criteria for issuing a license. 970 F.3d at 122, 125.

13

530 F.2d 457 (2d Cir. 1976).  But neither decision supports – much less compels – the conclusion reached by the panel here.

*Whole Woman's Health* involved a challenge to the Texas Heartbeat Act (the "Act"), which "prohibits physicians from 'knowingly perform[ing] or induc[ing] an abortion on a pregnant woman if the physician detected a fetal heartbeat for the unborn child' unless a medical emergency prevents compliance."  595 U.S. at 35 (quoting Tex. Health & Safety Code Ann. §§ 171.204(a), 171.205(a)).  Because the Act largely precluded state officials from enforcing its provisions, instead allowing private citizens to sue any physician who performed a covered procedure, the plaintiffs sought to head off the risk of liability by seeking an injunction to prevent Texas state-court judges from "entertaining disputes between private parties" under the Act.  *Id.* at 40.  Unremarkably, the Supreme Court explained that when judges act in their regular capacities as neutral and impartial arbiters of disputes between parties, they cannot be said to "wage battle as contestants in the parties' litigation."  *Id.*  Instead, judges acting in that role "exist to resolve controversies about a law's meaning or its conformance to the Federal and State Constitutions."  *Id.*  Since judges acting in that neutral role necessarily lack adversity to the parties before them, "no case or controversy exists

14

between a judge who adjudicates claims under a statute and a litigant who attacks the constitutionality of the statute." *Id.* (internal quotation marks omitted). For that reason, the plaintiffs' claims could not proceed against the defendant judge in an Article III court.

*Mendez* applied the same basic doctrinal principles. There, the plaintiff wanted to obtain a divorce under New York law but would have been precluded from doing so by a two-year "jurisdictional" residency requirement. 530 F.2d at 458. Proceeding under the assumption that the state courts would have rejected her divorce complaint for failure to satisfy the residency requirement, the plaintiff intervened in a suit brought against a state-court judge challenging the requirement's constitutionality. *Id.* In holding that the plaintiff's suit did not present a justiciable case or controversy as against the defendant judge, we agreed with the district court's conclusion that in applying the residency requirement the judge would be in the posture "of an entirely disinterested judicial officer and not in any sense the posture of an adversary to the contentions made on either side of the case." *Id.* at 459 (internal quotation marks omitted). We explained that "a court's investigation of its jurisdiction is eminently a judicial function" and that a suit against a judge responsible for ruling on jurisdiction would not present the

15

sort of "honest and actual antagonistic assertion of rights" that is "indispens[a]ble" to adjudication of constitutional questions" in federal court. *Id.* at 460 (internal quotation marks omitted).

Read in context, *Whole Woman's Health* and *Mendez* stand for the uncontroversial proposition that judges who act in their usual capacity as neutral and impartial arbiters are not adverse to those affected by their rulings. The question presented in this case is whether upstate New York judges fit within that paradigm when they act in their separate capacities as the State's handgun-licensing officers.

Clearly, the answer to that question is "no": licensing decisions involve an exercise of regulatory authority on behalf of the government, not a neutral and impartial adjudication of rights. A government license represents "'a right or permission granted in accordance with law . . . to engage in some business or occupation, to do some act, or to engage in some transaction which but for such license would be unlawful.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 595 (2011) (quoting Webster's Third New International Dictionary 1304 (2002)). The decision of whether to grant such a license reflects a core exercise of "police powers," rather than of judicial power that traditionally requires a neutral

magistrate or an impartial tribunal. *People ex rel. Lodes v. Dep't of Health of City of N.Y.*, 189 N.Y. 187, 192 (1907). That is why such licensing decisions may be (and usually are) rendered by executive agencies and officials who are tasked by statute with advancing the government's regulatory interest in the relevant subject matter. *See Parker*, 478 F.3d at 376 (collecting cases).

A handgun license issued under section 400.00 of the Penal Law – whether by an upstate judge or a downstate law-enforcement officer – is no different. Such a license simply allows the holder to purchase and possess a handgun without violating New York's criminal laws against handgun possession. *See* N.Y. Penal Law § 265.20(a)(3). In applying for a New York handgun license, an applicant (whether upstate or downstate) does not invoke "a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Henderson*, 562 U.S. at 435. Instead, the right to seek a license, and the licensing officer's power to issue or deny the license, flows from a grant of regulatory authority pursuant to sections 265.00(10) and 400.00 of the Penal Law that is exercised identically by upstate judges and downstate law-enforcement officials. *See* N.Y. Penal Law §§ 265.00(10), 400.00(1). Indeed, New York courts have recognized that, in reviewing a license application, an upstate judge does not act "in his capacity as a . . . judge, but rather

17

. . . as a licensing officer," *Sibley v. Watches*, 148 N.Y.S.3d 574, 579 (4th Dep't 2021), and therefore cannot exercise the regular powers of "a court" with respect to the applicant, *Goldstein v. Schwartz*, 125 N.Y.S.3d 881, 882 (2d Dep't 2020).[4]

In determining whether to issue a New York handgun license, an upstate judge does not serve as a neutral arbiter any more than a downstate law-enforcement official exercising the same function does; instead, the judge acts as the functional equivalent of an "executive licensing official" tasked with controlling access to firearms. *Whole Woman's Health*, 595 U.S. at 45. To that end, the judge is required by statute to work together with law enforcement to investigate the applicant's fitness to possess firearms, which includes conducting an in-person interview of the applicant and may include issuing demands for additional information. *See* N.Y. Penal Law § 400.00(1)(o), (1)(o)(v), (4). Based on the information uncovered by the judge and law-enforcement officials during their investigation, the judge must render a determination that promotes the "State['s]

---

[4] The panel tries to duck *Sibley* and *Goldstein* on the ground that those cases' description of the role of licensing officers is "mere *dicta*." *See* Am. Op. at 23 & n.10 (quoting *Morales v. Everett*, No. 7:24-cv-5437 (NSR), 2025 WL 1549030, at *2 (S.D.N.Y. May 30, 2025) (discussing *Goldstein*)). Not so. The Fourth and Second Departments' conclusion that upstate judges do not act in their capacities as judges or as members of a court when considering handgun-license applications was *essential* to the courts' holdings that those judges lacked the power to enter injunctions. *Sibley*, 148 N.Y.S.3d at 579–80; *Goldstein*, 125 N.Y.S.3d at 882. And although the question of adversity under Article III is ultimately one of federal law, New York law indicates that upstate judges who act as licensing officers do not do so in their usual capacities as state judges.

. . . substantial and legitimate interest . . . in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character which should be present in one entrusted with a dangerous instrument." *Zeltins v. Cook*, 107 N.Y.S.3d 909, 910 (4th Dep't 2019) (internal quotation marks omitted); *see* N.Y. Penal Law § 400.00(1)(b). Simply put, the judge assumes the role of an interested government regulator in every way that matters.

The state-court review procedures discussed at length in the panel's amended opinion, *see* Am. Op. at 21–23, only further confirm that upstate judges acting as licensing officers do not do so in a neutral and impartial capacity. Unlike a litigant seeking to contest an unfavorable judgment rendered by a New York trial court, *see* N.Y. C.P.L.R. § 5701(a)(1), an unsuccessful upstate license applicant has no right to directly appeal an unsuccessful licensing decision. *See Guthmann v. Onondaga Cnty. Sheriff's Dep't*, 230 N.Y.S.3d 883, 883 (4th Dep't 2025). Instead, the applicant must seek judicial review by suing the judge directly through a declaratory judgment action or a special proceeding under Article 78 of the New York Civil Practice Law & Rules. *See id.*; Am. Op. at 21–23. In such an action, the judge – invariably represented by the state attorney general – is responsible for

19

defending his licensing decision and the statutory provisions that his decision was based on as a *party* to the proceedings. *See, e.g.*, *Seymour v. Nichols*, 801 N.Y.S.2d 426, 427–28 (3d Dep't 2005) (successful defense by Nichols against a constitutional challenge to a part of New York's licensing statute and his decision denying a handgun license). Put differently, New York law already effectively assigns to upstate judges the task of defending against legal challenges to their licensing determinations, including the statutory provisions that those determinations are based on. Upstate judges serving as licensing officers therefore plainly have an "institutional interest in defending New York's firearms[-]licensing scheme." Am. Op. at 27.

Upstate judges who serve as licensing officers in New York are also readily distinguishable from the judges sued in the out-of-circuit decisions relied on by the panel. *See id.* at 16. Unlike the upstate judges here, none of the judges sued in those cases acted as the functional equivalent of an "executive licensing official" in taking the challenged action. *Whole Woman's Health*, 595 U.S. at 45. Instead, they performed functions akin to deciding whether to grant bail, issuing restraining orders, resolving litigation, and controlling judicial dockets. *See, e.g.*, *Frazier v. Prince George's County*, 140 F.4th 556 (4th Cir. 2025) (judges who rule on bail

20

applications); *Reule v. Jackson*, 114 F.4th 360 (5th Cir. 2024) (administrative judges who consider requests by vexatious litigants to file new cases); *Lindke v. Tomlinson*, 31 F.4th 487 (6th Cir. 2022) (judges who consider petitions for a personal protection order and resolve subsequent litigation seeking enforcement of such orders); *Allen v. DeBello*, 861 F.3d 433 (3d Cir. 2017) (judges who make child-custody determinations). In contrast to the statutory schemes at issue in those cases, New York's licensing regime enlists judges as state regulators, requiring them to perform the same classically executive function of deciding whether to grant licenses on behalf of the State as their downstate law-enforcement counterparts. *See* N.Y. Penal Law § 265.00(10).

For that reason, upstate judges who serve as licensing officers are more like the judges who were sued in *Georgevich v. Strauss*, 772 F.2d 1078 (3d Cir. 1985) (en banc). In *Georgevich*, the Third Circuit en banc "held that state court judges who were administrators of the parole power under state statutes were proper parties to a section 1983 suit challenging the constitutionality of those statutes." *Allen*, 861 F.3d at 440 (citing *Georgevich*, 772 F.2d at 1087). The court explained that Pennsylvania's parole regime "divides the authority to make parole decisions between the sentencing judges and the [state parole board]." *Georgevich*, 772 F.2d

at 1088. Because the defendant judges were sued in their capacities as administrators of a form of executive power shared with the state's parole board – rather than "in their judicial capacity as neutral adjudicators of disputes" – the court held that "there is no reason why the [parole board], but not the judges, may be sued on a similar challenge." *Id.* at 1087–88.

So too here. Nichols is not being sued in his usual role as a County Court judge who acts as a neutral adjudicator of disputes, but rather as an administrator of New York's police power to regulate the possession of handguns through case-by-case licensing decisions. A state official simply cannot exercise such a role – the same role fulfilled by executive officials in New York's downstate counties – while hiding behind the principle that neutral judges lack adversity to the parties appearing before them.

The panel contends that a downstate police commissioner or sheriff who denies a handgun-license application is different from an upstate judge who takes the same action because those law-enforcement officials also have the power to make arrests for unlicensed handgun possession. *See* Am. Op. at 18. According to the panel's logic, an adverse handgun-licensing decision therefore gives rise to a federal case or controversy only if it is made by an official who would, himself,

22

also have the authority to arrest or otherwise penalize the applicant for unlicensed handgun possession.

But courts have never defined Article III's adversity requirement so narrowly. For instance, a county clerk who unconstitutionally withholds a marriage license is surely subject to suit in federal court. *See, e.g.*, *Bostic v. Schaefer*, 760 F.3d 352, 371 (4th Cir. 2014) (explaining that the denial of a same-sex couple's marriage license could be traced to the defendant clerk's "enforcement of the allegedly unconstitutional Virginia Marriage Laws").[5] No one would say that a clerk who violates the Constitution by withholding a marriage license from a same-sex couple lacks adversity to the couple simply because the clerk could not add insult to injury by arresting them as well. Nor could it fairly be said that the judges in *Georgevich* did not act as enforcers or administrators of Pennsylvania's parole statutes merely because those judges did not also possess some kind of

---

[5] The panel unpersuasively attempts to distinguish county clerks who issue marriage licenses from officials who issue handgun licenses on the ground that issuing a marriage license is usually a "ministerial" act that is "operational" and "non-discretionary." Am. Op. at 20. What ultimately matters for purposes of Article III's adversity requirement is not the relative complexity or level of discretion underlying a challenged government act, but whether the defendant acted in a neutral and impartial role *vis-à-vis* the plaintiff. After all, does anyone seriously believe that county clerks who deny marriage licenses to gay couples would be beyond the reach of federal jurisdiction if the state adopted a statute allowing clerks to exercise discretion in deciding whether and to whom they issue marriage licenses?

23

power to make arrests. The same is true here. An upstate judge's exercise of state police power in denying a handgun license is plainly adverse to the unsuccessful applicant's asserted right to possess a handgun, regardless of whether that judge may personally arrest the applicant for unlicensed handgun possession.

The panel's wooden conception of adversity leads to absurd outcomes. Under the panel's approach, for example, a resident of the Bronx may sue the official responsible for denying his handgun-license application while a resident of neighboring Westchester County may not. *See* N.Y. Penal Law § 265.00(10). And under the panel's reasoning, a state could insulate its officials from suit in federal court by simply transferring authority to make licensing decisions – in areas as diverse as marriage-licensing or parade-permitting – from executive agencies and officers to local judges. So long as those licensing decisions involve a sufficient exercise of legal and factual judgment by officials who also hold office as judges, then, according to the panel, no federal court may entertain a suit against the relevant decisionmaker. The prospect of allowing a state to effectively pick and choose which of its residents may seek federal judicial relief against the officials responsible for unconstitutionally withholding state licenses raises serious constitutional and prudential concerns.

24

Finally, that licensing determinations are often considered judicial in nature for non-Article III purposes – such as common-law immunity – does not suggest a lack of adversity between the decisionmaker and an unsuccessful applicant. In those contexts, the "judicial" label reflects the fact that licensing determinations typically involve the resolution of "particularized, existing issues" through the application of legal and factual judgment to a specific set of circumstances. *Libertarian Party*, 970 F.3d at 124–25; *see also Hornsby v. Allen*, 326 F.2d 605, 608 (5th Cir. 1964) (observing that "licensing consists [of] the determination of factual issues and the application of legal criteria to them"). But the fact that a challenged government action involved the resolution of a particularized issue does not imply a lack of adversity between the relevant decisionmaker and the affected party; if it did, then licensing decisions made by executive officials and administrative agencies would also be unreviewable in federal court. *Contra* 5 U.S.C. §§ 551(13), 702, 704.[6]

---

[6] Judge Lohier insists that "Nichols's licensing decisions are not insulated from review" because (i) aggrieved applicants can sue to stop state executive officials from enforcing Nichols's decisions and (ii) Article 78 provides review for Nichols's decisions. *Ante* at 8 (Lohier, *J.*, concurring) (alteration adopted and internal quotation marks omitted). The first reason does not provide relief, and the second contradicts Judge Lohier's broader argument. *First*, an order stopping state officials from enforcing New York's criminal firearms laws against Kellogg and Harmon (should they somehow manage to procure a firearm) would not give them the ability to lawfully possess handguns, *i.e.*, the relief that they ultimately seek. In other words, not being prosecuted for illegally possessing a firearm is not the same as having a license to legally purchase a firearm.

25

Instead, Article III's adversity requirement is satisfied when the federal court is called upon to "resolve conflicting interests." 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3530 (3d ed. 2025). Although an exercise of judicial power by a neutral and impartial tribunal would, almost by definition, fail to create a conflict of interest between the judge and the affected party, *see id.*, an exercise of police power by a government regulator plainly can. And in the end, upstate judges who serve as licensing officers under New York's idiosyncratic handgun-licensing scheme, unlike the judges named as defendants in cases like *Whole Woman's Health* and *Mendez*, act as the functional equivalents of executive licensing officials. Accordingly, there is "no reason why [downstate law-enforcement officials], but not [upstate] judges, may be sued on a similar challenge" to New York's handgun-licensing scheme in their identical capacities as licensing officers. *Georgevich*, 772 F.2d at 1088.

**C. The Panel's Decision Creates Serious Remedial Problems for Upstate New Yorkers.**

The panel insists that its decision is "narrow," Am. Op. at 25, and that an upstate applicant who is unable to sue for a handgun license can still seek a

---

*Second*, the very fact that Kellogg and Harmon could challenge Nichols's decisions through an Article 78 proceeding – rather than through a direct appeal – proves the very point that the panel denied: namely, that they are adverse to him.

negative injunction to prevent law-enforcement officials from arresting him for criminal possession of a firearm without a license, *id.* at 25–26 & n.13. But the panel ignores the importance of licenses to New York's regulatory scheme and the practical difficulties of awarding effective judicial relief in the absence of jurisdiction over the state officials responsible for making licensing decisions.

As explained above, New York law makes clear that "[n]o [firearms] license shall be issued or renewed . . . except by the licensing officer." N.Y. Penal Law § 400.00(1). And in New York's upstate counties, licensing officers are state judges – not local sheriffs, not local prosecutors, not the state attorney general, not the governor, and (apart from the case of applications filed by certain law-enforcement retirees) not the superintendent of state police. *Id.* § 265.00(10). Thus, an injunction preventing law-enforcement officials from enforcing the criminal laws that prohibit the unlicensed possession of a firearm would do nothing to prevent the only upstate officials with the authority to make licensing decisions from continuing to rely on the challenged requirement (or any other unconstitutional basis, such as an applicant's race) in denying license applications. *See California v. Texas*, 593 U.S. 659, 672 (2021) (observing that "[r]emedies . . . ordinarily operate with respect to specific parties," as opposed to "operat[ing] on legal rules in the

27

abstract" (internal quotation marks omitted)); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, *J.*) (explaining that a federal court "cannot lawfully enjoin the world at large, no matter how broadly it words its decree").

Without the ability to sue the upstate judge responsible for withholding his license, the best that an upstate plaintiff can hope for from a federal court is an injunction to prevent a defendant law-enforcement official from arresting him for unlicensed handgun possession. But while such relief may solve the problem of criminal exposure, it does not mean that the plaintiff will be able to obtain a handgun in the first place, since under New York law no legitimate gun dealer will sell a handgun to one who fails to present a valid license. *See* N.Y. Penal Law § 400.00(12) (providing that gun dealers, "[b]efore delivering a firearm to any person," must "require him to produce either a license valid under this section to carry or possess the same, or proof of lawful authority as an exempt person pursuant to [N.Y. Penal Law § 265.20]").

Even if the still-unlicensed plaintiff could also obtain an injunction to shield gun dealers from criminal liability for selling a handgun to him, it is unlikely that a rational firearms dealer would go through with the sale. Although the dealer would be safe from criminal prosecution, the dealer would still run the risk of

28

losing *its own* firearms license for selling to an unlicensed person. Any licensing officer, including an upstate judge, who caught wind of the still-unlawful sale could rely on it to either *sua sponte* revoke the dealer's firearms license or refuse to renew the dealer's license. *See Bach v. Pataki*, 408 F.3d 75, 80 (2d Cir. 2005) (observing that licensing officers are "statutorily invested with the power to *sua sponte* revoke or cancel a license" and that this "extraordinary power . . . may be exercised at any time" (internal quotation marks omitted)). Other considerations – such as insurance requirements and the threat of private civil liability – would further militate against agreeing to conduct an unlawful sale even in the absence of any risk of criminal prosecution. *See, e.g.*, N.Y. Gen. Bus. Law § 898-b(2) (requiring participants in the firearms industry, including gun dealers, to prevent firearms from being "sold unlawfully"); *id.* § 898-e (creating a private right of action for damages suffered on account of a dealer's violation of the law). As a practical matter, the mere potential of these further consequences means that a would-be gun buyer who walks into an upstate New York gun store with a stack of negative injunctions, but no handgun license, will in all likelihood leave disappointed.[7]

---

[7] Judge Nathan opposes en banc review because she believes that there may be "other pre-enforcement challenges to safeguard the constitutional rights at issue." *Ante* at 2 (Nathan, *J.*,

Instead of seriously engaging with these problems, the panel half-heartedly gestures at potential distinguishing factors that may be present in future cases, suggesting that a different adversity analysis might control for as-applied challenges, for cases in which a plaintiff names other defendants in addition to the upstate judge who denied his license application, or for cases in which a plaintiff seeks additional forms of relief against the judge. *See* Am. Op. at 25–27 & n.13. But nothing in the panel's Article III analysis plausibly turns on these nuances. Instead, the panel's holding is as broad as it is clear: "there is no live case or controversy between New York state court judges serving as firearms[-]licensing officers and litigants challenging the State's licensing scheme." *Id.* at 14. Presenting a narrower challenge, seeking additional forms of relief, or naming an additional defendant would do nothing to alter the panel's conclusion that upstate judges act as neutral and impartial arbiters when considering handgun-license applications. Try as it might, the panel cannot escape the fact that under its analysis, upstate New Yorkers will no longer enjoy the same access to federal court in license-denial cases that downstate New Yorkers do.

---

concurring). But obtaining an injunction against criminal enforcement would not shield a prospective gun buyer from harm, since it is hardly a matter of "speculat[ion]" that a reputable firearms dealer will refuse to sell a handgun to an unlicensed buyer. *Id.*

### III.    Conclusion

Congress enacted section 1983 to "guarantee[] a federal forum for claims of unconstitutional treatment at the hands of state officials." *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019) (internal quotation marks omitted). Today, our Court insulates the New York State officials responsible for issuing handgun licenses to upstate New Yorkers from federal judicial scrutiny while allowing virtually identical challenges to be brought against downstate licensing officials. If that result were necessary to respect Article III's limits on judicial power, I would be compelled to go along. But because it instead rests on a grave misunderstanding of the role that upstate New York judges play in the State's handgun-licensing regime and creates an untenable disparity between upstate and downstate license applicants' access to federal court, I respectfully dissent.

MENASHI, *Circuit Judge*, joined by PARK, *Circuit Judge*, dissenting from the denial of rehearing *en banc*:

I join the other dissent in concluding that a judge who serves as a firearm licensing officer acts as an "executive licensing official[]" performing the "classically executive function of deciding whether to grant licenses." *Ante* at 2, 21 (Sullivan, J., dissenting from the denial of rehearing en banc). As a result, when a plaintiff alleges that the judge unconstitutionally denied him a license, there is adversity between the parties, and the plaintiff may seek injunctive relief against the judge.

For similar reasons, I would also hold that a judge who performs that executive function lacks absolute judicial immunity from a lawsuit for damages. The panel concluded that it was bound by prior precedent holding that "two New York state court judges functioned in their judicial capacity when they denied firearms license applications." *Kellogg v. Nichols*, 170 F.4th 20, 25 (2d Cir. 2026) (citing *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 123-25 (2d Cir. 2020)). In that prior case, our court decided that the judges were "entitled to absolute immunity for performance of judicial functions." *Libertarian Party*, 970 F.3d at 123. Applying that precedent, the panel in this case determined that the denials of the license applications "constituted 'judicial decisions' for which Judge Nichols was entitled to absolute judicial immunity from suit for damages in his individual capacity." *Kellogg*, 170 F.4th at 25 (quoting *Libertarian Party*, 970 F.3d at 125).

Because the panel concluded that Judge Nichols performed the role of licensing officer as a neutral adjudicator, he was (1) not adverse to the plaintiffs, requiring the dismissal of the claim for injunctive relief, and (2) entitled to absolute judicial immunity,

requiring the dismissal of the claims for damages. These two holdings of the panel—with respect to injunctive relief and to damages—both reflect the view that a judge serving as a licensing officer performs a judicial function.

The other dissent observes that the conclusions about adversity and immunity need not align: "[T]hat licensing determinations are often considered judicial in nature for non-Article III purposes—such as common-law immunity—does not suggest a lack of adversity between the decisionmaker and an unsuccessful applicant." *Ante* at 25. Even so, it would be a surprising result if an adjudicator were judicial enough to receive absolute immunity against a litigating applicant yet executive enough to create adversity with the same applicant for the same controversy.

In my view, the applicable law does not require that inconsistent result. I would rehear this case *en banc* to hold that the licensing adjudicator not only is adverse to the applicant but also lacks absolute judicial immunity from suit. The contrary conclusions of the panel opinion conflict with controlling decisions of the Supreme Court. *See* Fed. R. App. P. 40(b)(2)(B).

## I

The panel opinion held that a judge acting as a licensing officer is absolutely immune from a lawsuit for damages. The panel explained that our prior decision in *Libertarian Party* "determined that two New York state court judges functioned in their judicial capacity when they denied firearms license applications." *Kellogg*, 170 F.4th at 25 (citing *Libertarian Party*, 970 F.3d at 123-25). Because we had previously "held that state court judges are entitled to absolute immunity from claims asserted against them in their individual

capacities as firearms licensing officers," *id.* (citing *Libertarian Party*, 970 F.3d at 125), the panel did so again here. That was wrong.

As the other dissent explains, under the licensing scheme here "the judge assumes the role of an interested government regulator in every way that matters." *Ante* at 19. For acts undertaken in such a role, a government official receives qualified rather than absolute immunity. Judge Nichols is therefore entitled only to qualified immunity.

**A**

When a government official faces a lawsuit for damages under 42 U.S.C. § 1983, he may raise one of two types of immunity that function as "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The first is qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The second is absolute immunity. Absolute immunity prevents the lawsuit from proceeding regardless of the underlying conduct or the intention of the government official. *See Forrester v. White*, 484 U.S. 219, 224-25 (1988). For example, absolute judicial immunity, which provides an "exemption of the judges from civil liability," cannot "be affected by the motives with which their judicial acts are performed." *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1871). So the "purity of their motives" will not "be the subject of judicial inquiry." *Id.*

Whether a government official receives qualified or absolute immunity depends on the duties he performed rather than his formal

3

title. In other words, each type of "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester*, 484 U.S. at 227.

A judge performing a judicial function has absolute immunity from lawsuits that would impose liability for his judicial acts. But "a judge is not immune from liability for nonjudicial actions, *i.e.,* actions not taken in the judge's judicial capacity." *Mireles v. Waco*, 502 U.S. 9, 11 (1991). It is irrelevant that he holds a judicial office. "Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance." *Ex parte Virginia*, 100 U.S. 339, 348 (1879).

An executive official is normally entitled only to qualified immunity. *See Butz v. Economou*, 438 U.S. 478, 508 (1978). The Supreme Court has said, however, that an executive official will be absolutely immune from suit when he conducts an "adjudication" that "shares enough of the characteristics of the judicial process." *Id.* at 512-13. The Court has called this "quasi-judicial" immunity because the executive official receives the same immunity—absolute—that judges typically receive. *Forrester*, 484 U.S. at 225.

But the labels *judicial* and *quasi-judicial* are misleading because the immunity protects the function rather than the official. Both labels refer to the principle that absolute immunity attaches to a judicial act irrespective of the person who performs it. We have recognized that even "[a] *private actor* may be afforded the absolute immunity ordinarily accorded judges performing their authorized judicial functions if the private actor's role is functionally comparable to the roles of those judges or his acts are integrally related to an ongoing

4

judicial proceeding." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009) (emphasis added) (internal quotation marks and citation omitted).

Historically, absolute judicial immunity "extended not only to judges narrowly speaking … but also to private citizens (in particular jurors and arbitrators); the touchstone for its applicability was performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Burns v. Reed*, 500 U.S. 478, 499-500 (1991) (Scalia, J., concurring in the judgment in part and dissenting in part). Thus, "[t]he common law recognized a 'judicial' immunity, which protected judges, jurors and grand jurors, members of courts-martial, private arbitrators, and various assessors and commissioners." *Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring). This absolute immunity applied "to military and naval officers in exercising their authority to order courts-martial for the trial of their inferiors, or in putting their inferiors under arrest preliminary to trial," and "to members of a township board in deciding upon the allowance of claims." Thomas M. Cooley, A Treatise on the Law of Torts 410-11 (1879). In this way, the "rule of judicial immunity" was not "restricted in its protection to the judges proper." *Id.* at 410.

At the same time, a judge who performed a non-judicial act did not receive absolute immunity for that act. In *Ex parte Virginia*, a judge unlawfully excluded African American citizens from a jury. The Supreme Court explained that "[t]he duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge," and in fact that duty was often "given to county commissioners, or supervisors, or assessors. In former times, the selection was made by the sheriff." 100 U.S. at 348. Given that background, the Court concluded that "it surely is not a judicial act" but "is merely a ministerial act, as much so as the act of a sheriff

5

holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id.* When the law asks a judge to perform a non-judicial duty, his acts do not receive absolute immunity.

As a result, a court must "examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted." *Forrester*, 484 U.S. at 224. The question is whether the official has been "charged with resolving disputes between other parties or authoritatively adjudicating private rights." *Kalina*, 522 U.S. at 132 (Scalia, J., concurring). After all, "[j]udicial officers are defined[] as those whose duties are to decide controversies between individuals, and accusations made in the name of the public against persons charged with a violation of the law." 2 Francis Hilliard, Law of Torts 311 (1859). When public officials instead "made discretionary policy decisions that did not involve actual adjudication, they were protected by 'quasi-judicial' immunity, which could be defeated by a showing of malice, and hence was more akin to what we now call 'qualified,' rather than absolute, immunity." *Kalina*, 522 U.S. at 132 (Scalia, J., concurring).

This historical background matters because while § 1983 "on its face admits of no immunities," the Supreme Court has "read it 'in harmony with general principles of tort immunities and defenses rather than in derogation of them.'" *Malley v. Briggs*, 475 U.S. 335, 339 (1986) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). An immunity is therefore available under § 1983 if it was "historically accorded [to] the relevant official at common law." *Imbler*, 424 U.S. at 421. But if "a tradition of absolute immunity did not exist as of 1871," the Court has "refused to grant such immunity under § 1983." *Burns*, 500 U.S. at 498 (Scalia, J., concurring in the judgment in part and dissenting in part).

6

While "[t]he common law extended qualified immunity to public officials quite liberally," it was "exceedingly rare" for such officials to receive "[a]bsolute immunity." *Id.* at 498 n.1. The Supreme Court has accordingly recognized a "presumption" that "qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties," and the Court has "been 'quite sparing' in [its] recognition of absolute immunity." *Id.* at 486-87 (majority opinion) (quoting *Forrester*, 484 U.S. at 224). The Court has "refused to extend it any 'further than its justification would warrant.'" *Id.* at 487 (quoting *Harlow*, 457 U.S. at 811).

**B**

At common law, an adjudicator received absolute immunity if he acted to "decide controversies between individuals, and accusations made in the name of the public against persons charged with a violation of the law." Hilliard, *supra*, at 311. The contemporary doctrine tracks the historical rule, but—instead of an "analogical inquiry," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 29 (2022)—the Supreme Court has developed a six-part test to determine whether an adjudicator acted in a judicial or administrative capacity.[1]

The test originated in *Butz v. Economou*, in which a plaintiff sued "a number of officials in the Department of Agriculture claiming that they had instituted an investigation and an administrative proceeding against him in retaliation for his criticism of that agency." 438 U.S. at 480. The Supreme Court concluded that these executive

---

[1] *Cf.* Stephen E. Sachs, *Originalism: Standard and Procedure,* 135 Harv. L. Rev. 777, 810 (2022) ("So long as these checklists or *n*-factor tests operate as fallible heuristics for the underlying law, rather than alternative requirements in place of the law, they can serve as external decision procedures for adhering to an originalist standard.").

officials had absolute immunity because "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process." *Id.* at 512-13. The Court explained that the "conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court." *Id.* at 513. And "federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process." *Id.* The proceedings "are adversary in nature," "are conducted before a trier of fact insulated from political influence," allow a party "to present his case by oral or documentary evidence," limit "the exclusive record for decision" to "the transcript of testimony and exhibits together with the pleadings," and afford the parties the right "to know the findings and conclusions on all of the issues of fact, law, or discretion presented on the record." *Id.*

The Court additionally observed that "the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency." *Id.* Under these circumstances, "the role of the modern federal hearing examiner or administrative law judge within this framework is 'functionally comparable' to that of a judge," so officials "subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts." *Id.* at 513-14.

Later, in *Cleavinger v. Saxner*, the Court considered "whether members of a federal prison's Institution Discipline Committee, who hear cases in which inmates are charged with rules infractions, are entitled to absolute, as distinguished from qualified, immunity." 474 U.S. 193, 194 (1985). To answer that question, the Court distilled from *Butz* a multi-factor test for deciding whether an administrative

adjudication resembled "the judicial process." *Id.* at 202. That test requires a court to analyze several factors:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Id.* (citing *Butz*, 438 U.S. at 512). These factors have a basis in the common law. The first factor reflects one historical justification for absolute immunity: "that the law has so much respect for the certainty of judgments and authority of judges, that it will not permit any error to be assigned which impeaches them in their trust and office." Hilliard, *supra*, at 311. Lord Tenterden, chief justice of the King's Bench, described the principle this way:

> This freedom from action and question at the suit of an individual is given by the law to the judges, not so much for their own sake as for the sake of the public, and for the advancement of justice, that, being free from actions, they may be free in thought and independent in judgment, as all who are to administer justice ought to be. … In the imperfection of human nature it is better, even, that an individual should occasionally suffer a wrong than that the general course of justice should be impeded and fettered by constant and perpetual restraints and apprehensions on the part of those who are to administer it.

*Williamson v. Lacy*, 29 A. 943, 945 (Me. 1893) (quoting *Garnett v. Ferrand* (1827) 108 Eng. Rep. 576, 581-82 (KB)).[2]

The second and sixth factors reflect the principle that an incorrect judicial decision can and should be corrected on appeal rather than attacked in a suit for damages against the judge. *See Pratt*, 56 Mass. at 70 ("His judgment may be revised in an appellate court, and reversed or affirmed; but he himself can be liable only to an impeachment for corruption or other misconduct, if there be any."); *Mather v. Hood*, 8 Johns. 44, 51 (N.Y. Sup. Ct. 1811) ("[T]he justice is not responsible by suit for the proceeding; because it is a judicial act. … [A]ccording to settled principles of law, a record of such proceeding which is regular and correct upon the face of it, cannot be questioned or traversed in a collateral action."). The fifth factor reflects the core of the judicial function "to decide controversies between individuals." Hilliard, *supra*, at 311.

The *Cleavinger* Court applied the multi-factor test to the prison adjudication. The Court recognized that "[t]he committee members, in a sense, do perform an adjudicatory function in that they determine whether the accused inmate is guilty or innocent of the charge leveled against him; in that they hear testimony and receive documentary evidence; in that they evaluate credibility and weigh evidence; and in that they render a decision." *Cleavinger*, 474 U.S. at 203. And the Court

---

[2] *See also Pratt v. Gardner*, 56 Mass. 63, 69 (1848) ("[E]very judge … should act upon his own free, unbiassed convictions, uninfluenced by any apprehension of consequences. … He is not bound, at the peril of an action for damages, or of a personal controversy, to decide right, in matter either of law or of fact; but to decide according to his own convictions of right, of which his recorded judgment is the best, and must be taken to be conclusive, evidence. Such, of necessity, is the nature of the trust assumed by all on whom judicial power, in greater or lesser measure, is conferred.").

acknowledged the presence of procedural safeguards.[3] But other factors pointed in the opposite direction. The committee members "are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision," which means that they "are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee." *Cleavinger*, 474 U.S. at 204. Moreover, "[u]nder the Bureau's disciplinary policy in effect at the time of respondents' hearings, few of the procedural safeguards contained in the Administrative Procedure Act under consideration in *Butz* were present." *Id.* at 206. The inmate "was to be afforded neither a lawyer nor an independent nonstaff representative," had "no right to compel the attendance of witnesses or to cross-examine," had "no right to discovery," received the benefit of "no cognizable burden of proof," was given "[n]o verbatim transcript," and could be disciplined based on "[i]nformation presented [that] often was hearsay or self-serving." *Id.*

In the end, the Court saw "no identification with the judicial process of the kind and depth that has occasioned absolute immunity." *Id.* The committee members instead received qualified immunity.

---

[3] *See Cleavinger*, 474 U.S. at 206 ("Among these are the qualifications for committee service; prior notice to the inmate; representation by a staff member; the right to present certain evidence at the hearing; the right to be present; the requirement for a detailed record; the availability of administrative review at three levels (demonstrated by the relief obtained on review by these respondents at the first two levels); and the availability of ultimate review in federal court.").

11

## C

The decision of our court in *Libertarian Party* involved the same statute as this case and similar facts: Judges acted as "licensing officer[s]" to decide whether applicants would receive a "firearm license." 970 F.3d at 124. Our court concluded that "the rulings on firearm license applications were judicial decisions" and that the defendant judges were "entitled to absolute immunity from the claims asserted against them in their individual capacities." *Id.* at 125.

First, we noted that the "[a]ctual rulings" on the firearm license applications "directly addressed the specific applications, referred to relevant requirements of § 400.00, and decided the merits of the applicants' requests." *Id.* at 124. Second, we focused on the official trappings of each judge's decision. We emphasized that one judge who ruled on an application "entered a signed order of the 'State of New York, Supreme Court: County of Erie'" to announce the decision. *Id.* We observed that another judge informed the applicant of the denial of his application "by way of a letter on a State of New York, Wayne County Court letterhead rather than in an order." *Id.* at 125. Even though that was less formal than a court order, we explained that "the 10-paragraph letter directly ruled on the application, referring in detail to the factual and statutory basis for the denial." *Id.* The opinion in *Libertarian Party* concluded that each judge made a "judicial decision[]" when ruling on the firearm license application. *Id.*

That brings us to this case. The panel opinion determined without much additional comment that "*Libertarian Party* controls our decision under the circumstances of this case." *Kellogg*, 170 F.4th at 25 n.2.

12

The other dissent from the denial of rehearing *en banc* correctly concludes that "New York's licensing regime enlists judges as state regulators, requiring them to perform the same classically executive function of deciding whether to grant licenses on behalf of the State as their downstate law-enforcement counterparts." *Ante* at 21. Because the judges act as executive adjudicators when deciding license applications, the judges may be sued for injunctive relief. Under *Libertarian Party*, however, those executive actions are considered sufficiently judicial for the judges to receive absolute judicial immunity from lawsuits for damages.

It might not be impossible for the applicable case law to yield that inconsistent result. But in this case it does not. I would rehear this case *en banc* to reverse the holding of the panel opinion not only with respect to adversity but also with respect to immunity. The judge in this case—like the judges in *Libertarian Party*—acted in an executive capacity when ruling on firearm license applications. So he should have received qualified rather than absolute immunity.

**1**

Our decision in *Libertarian Party* was wrong and should be abandoned. The court in that case did not address the *Cleavinger* factors even though we had previously explained that we apply "the *Cleavinger* factors" to determine whether "absolute immunity" is "appropriate." *Tulloch v. Coughlin*, 50 F.3d 114, 116 (2d Cir. 1995); *see also Mitchell v. Fishbein*, 377 F.3d 157, 172 (2d Cir. 2004) ("In deciding whether an actor is entitled to absolute immunity on the basis that his role is analogous to that of a judge, we evaluate the challenged proceedings in light of the 'characteristics of the judicial process' set forth in *Butz v. Economou*.") (quoting *DiBlasio v. Novello*, 344 F.3d 292, 297 (2d Cir. 2003)). Instead, *Libertarian Party* focused on the formalities

13

of the licensing decisions. But it does not matter whether a licensing decision is communicated through a court order, on official stationery, or by other means. It is "the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis." *Forrester*, 484 U.S. at 229. The opinion in *Libertarian Party* emphasized that the judges' licensing decisions were attributable to judicial institutions. But the analysis must focus on the function the judge performed rather than his institutional affiliation.

If the court in *Libertarian Party* had considered the *Cleavinger* factors, it would have been compelled to conclude that ruling on a firearm license application is not a judicial act. I consider those factors here.

First, we assess the "need to assure that the individual can perform his functions without harassment or intimidation." *Cleavinger*, 474 U.S. at 202. "Here, there's no dispute that state officials making [firearm] licensing decisions should be able to do their jobs without facing harassment." *Cooperrider v. Woods*, 127 F.4th 1019, 1049 (6th Cir. 2025) (Thapar, J., concurring in part and dissenting in part). But this factor is not dispositive. The Court in *Cleavinger* could "acknowledge that many inmates do not refrain from harassment and intimidation" of the committee members. *Cleavinger*, 474 U.S. at 203. But it nevertheless concluded that qualified rather than absolute immunity applied. *See id.* at 207; *see also Flying Dog Brewery, LLLP v. Mich. Liquor Control Comm'n*, 597 F. App'x 342, 350 (6th Cir. 2015) (reaching the same result).

Second, we evaluate "the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Cleavinger*, 474 U.S. at 202. In *Cleavinger*,

14

the Court recognized the presence of "safeguards to ensure the avoidance or correction of constitutional errors." *Id.* at 206. There were qualifications for serving on the committee as well as rights of the inmate to prior notice, to representation by a staff member, to the presentation of evidence, to be present, and to receive a detailed record; there were also three levels of administrative review followed by review in federal court. *See supra* note 3. But that was not enough. The inmate was "afforded neither a lawyer nor an independent nonstaff representative" and had "no right to compel the attendance of witnesses or to cross-examine" and "no right to discovery." *Cleavinger*, 474 U.S. at 206. In addition, the proceedings involved "no cognizable burden of proof," the record did not include a "verbatim transcript," and the testimony could be "hearsay or self-serving." *Id.*

The licensing hearings in *Libertarian Party* and in this case resemble the insufficient procedures described in *Cleavinger*. The relevant statute contains few express safeguards. The licensing officer must, for example, "deny the application for reasons specifically and concisely stated in writing or grant the application and issue the license applied for." N.Y. Penal Law § 400.00(4-b). The requirement of a written explanation is often considered an important safeguard. *See Flying Dog Brewery*, 597 F. App'x at 351. But the value of the safeguard is diminished when the "reasons" need only be "concisely stated." In *Libertarian Party*, one denial was explained with only three conclusory sentences.[4] Because the statute does not require the licensing officers

---

[4] Here is the entirety of the order denying the application: "After a full review of the application for an unrestricted firearms license pursuant to Section 400.00 of the New York State Penal Law, the Court has determined that the applicant has sufficient basis to be granted a firearms license for hunting and target shooting. Applicant has not demonstrated sufficient *proper cause* to be granted an unrestricted firearms license as required by section 400.00-2(f) of the New York State Penal Law. A firearms license

15

"to explain their decisions through findings of fact and conclusions of law, unconstitutional decision-making may remain largely unchecked even where judicial review is available." *Flying Dog Brewery*, 597 F. App'x at 351.

Other than the weak requirement of a brief statement of reasons, the statute does not provide meaningful safeguards. An applicant who appears for a hearing does not receive an attorney or a representative, and the statute does not mention a right to "compel the attendance of witnesses or to cross-examine." *Cleavinger*, 474 U.S. at 206.[5] It does not provide a right to discovery or specify a burden of proof. And it does not address limitations on the admissibility of hearsay information.

Importantly, the statute provides specific safeguards for those who appeal denied applications. A rejected applicant may "request a hearing to appeal the denial." N.Y. Penal Law § 400.00(4-a). In this part of the statute, the legislature specified that "[a]n individual may be represented by counsel at any appearance before the appeals board and shall be afforded an opportunity to present additional evidence in support of their application." *Id.* The statute mentions such

---

restricted to hunting and target shooting as set forth above is therefore GRANTED to the applicant. SO ORDERED." *Libertarian Party*, 970 F.3d at 124.

[5] In this case, "at the beginning of each hearing, the applicant was advised of his rights to be represented by an attorney and to call witnesses." Appellee's Br. 4 (citing Transcript of Pistol Permit Hearing for Jeremy Kellogg at 3-4, *Kellogg v. Nichols*, No. 23-CV-658 (N.D.N.Y. July 13, 2023), ECF No. 6.4; Transcript of Pistol Permit Hearing for Jonathan Harmon at 3-4, *Kellogg v. Nichols*, No. 23-CV-658 (N.D.N.Y. July 13, 2023), ECF No. 6.5). But the statute does not appear to mandate those procedures.

safeguards only in the procedure for appellate review.[6] Those safeguards parallel the extensive appellate procedure in *Cleavinger*—involving three levels of administrative review followed by review in federal court. Despite those appellate safeguards, the *Cleavinger* Court afforded the adjudicators of the initial hearings only qualified immunity. As in *Cleavinger*, this factor disfavors absolute immunity here.

Third, we consider whether the decisionmaking process reflects "insulation from political influence." *Cleavinger*, 474 U.S. at 202. This factor favors absolute immunity because, as a member of the judiciary, the licensing judge is not an "employee[]" of an agency or a "direct subordinate[]" of an executive officer. *Id.* at 204.

Fourth, we examine "the importance of precedent" in the proceeding. *Id.* at 202. Like other "features of the judicial process," precedents "enhance the reliability of information and the impartiality of the decisionmaking process." *Butz*, 438 U.S. at 512. The statute here "does not mention precedent as a relevant rule of decision." *Cooperrider*, 127 F.4th at 1050 (Thapar, J., concurring in part and dissenting in part). And precedent does not appear to have been consulted during the proceedings in *Libertarian Party* or in this case. "Thus, unlike when precedent is vital to underlying proceedings, the dispute here lacked a key 'check on malicious action'" by the adjudicator. *Id.* (alteration omitted) (quoting *Butz*, 438 U.S. at 512).

---

[6] And even then, the appellate procedure is available only when the initial denial was made by a non-judge licensing officer. *See* 9 N.Y.C.R.R. § 6059.1(b). When an upstate judge denies a license, the "judge's licensing decisions are subject to judicial review by the Appellate Division in Article 78 proceedings." *Kellogg*, 170 F.4th at 30.

The licensing officers "do not appear to be bound by any precedent typical of a legal inquiry." *Flying Dog Brewery*, 597 F. App'x at 351.

Fifth, we consider "the adversary nature of the process." *Cleavinger*, 474 U.S. at 202. An adversary proceeding imposes a restraint on the advocates "by the knowledge that their assertions will be contested by their adversaries in open court." *Butz*, 438 U.S. at 512. In this case, Judge Nichols as the licensing officer indicated that the two plaintiffs could call witnesses on their own behalf. *See supra* note 5. But the proceedings did not involve competing witnesses or evidence from the government that could be subjected to adversary testing. The licensing process involves the applicant providing information to the government, appearing before the judge for brief questioning, and waiting for the judge to evaluate that information himself. *See* Transcript of Pistol Permit Hearing for Jonathan Harmon, *supra* note 5, at 21 ("What I do from here forward is I'll re-review the file and consider everything that's been put on the record. And then I make a determination of whether I approve or disprove your application for a pistol license."); Transcript of Pistol Permit Hearing for Jeremy Kellogg, *supra* note 5, at 7 ("I'll make a decision on your application after today. It may take me sometime to get to it."). These hearings do not reflect an adversary process between the applicant and the government.

Sixth, we take into account "the correctability of error on appeal." *Cleavinger*, 474 U.S. at 202. Although the statute creates an appellate procedure for denied applications, *see* N.Y. Penal Law § 400.00(4-a), that procedure is available only when a non-judge licensing officer denies the application, *see* 9 N.Y.C.R.R. § 6059.1(b). As the other dissent explains, when an upstate judge denies a license, the "applicant must seek judicial review by suing the judge directly through a declaratory judgment action or a special proceeding under

18

Article 78." *Ante* at 19. The Article 78 proceeding begins in the Appellate Division. *See Diperna-Gillen v. Ryba*, 215 A.D.3d 1193, 1193 (3d Dep't 2023) (citing N.Y. C.P.L.R. § 506(b)(1)); *see also Aron v. Becker*, 48 F. Supp. 3d 347, 371 (N.D.N.Y. 2014) ("Under CPLR § 7804(e), a respondent judge or justice is required to file a certified copy of the record underlying the determination on the application."). Further review might be possible in the New York Court of Appeals—or in the Supreme Court if the case involves a federal question. *See* 28 U.S.C. § 1257(a).

When we evaluate the appellate procedure, we are especially concerned with the "correction of constitutional errors." *Cleavinger*, 474 U.S. at 206. In New York, an Article 78 proceeding is designed to review the "legality of administrative action" rather than the "constitutionality of the statute" under which the action was taken. *Town of Arietta v. State Bd. of Equalization & Assessment*, 37 A.D.2d 431, 433 (3d Dep't 1971). The panel opinion notes that when "[f]aced with constitutional challenges to New York state statutes, the Appellate Division can conduct a hybrid Article 78 proceeding and declaratory judgment action or convert the proceeding into an action for a declaratory judgment pursuant to N.Y. C.P.L.R. § 103(c) in order to address the plaintiff's challenges to the constitutionality of the statutes at issue." *Kellogg*, 170 F.4th at 30 (internal quotation marks, alterations, and citation omitted). The reason that a hybridization or conversion is necessary is that Article 78 proceedings are "inappropriate vehicles to test the constitutionality of legislative enactments." *Overhill Bldg. Co. v. Delany*, 28 N.Y.2d 449, 458 (1971).

In *Cleavinger*, the prison disciplinary proceeding was subject to three levels of administrative review followed by a habeas proceeding in federal court—the type of proceeding that normally reviews the legality of a detention. *See Cleavinger*, 474 U.S. at 206 (citing 28 U.S.C.

§ 2241). In this case and in *Libertarian Party*, the licensing proceeding was subject to no administrative review at all but only a judicial proceeding that does not normally entertain constitutional challenges but might be converted into a different proceeding in order to evaluate one. It is not possible to say that the process here shows a greater likelihood than the process in *Cleavinger* of correcting constitutional errors on appeal.

Applying the six *Cleavinger* factors reveals that the licensing hearings in this case and in *Libertarian Party* lack most features "characteristic of the judicial process." *Id.* at 202. Because the licensing determination in this case was an executive rather than a judicial act, the licensing officer should have received qualified rather than absolute immunity.

**2**

The "touchstone" for applying absolute immunity has historically been the "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Burns*, 500 U.S. at 500 (Scalia, J., concurring in the judgment in part and dissenting in part). A firearm licensing officer neither resolves disputes between parties nor authoritatively adjudicates private rights. He instead undertakes "official acts involving policy discretion but not consisting of adjudication." *Id.* That type of officer, "like assessors of lands for taxation," Cooley, *supra*, at 411, historically received a defeasible immunity "akin to what we now call 'qualified,' rather than absolute, immunity," *Kalina*, 522 U.S. at 132 (Scalia, J., concurring).

Rehearing is warranted to align our case law with that history and with the precedents of the Supreme Court that reflect it. "We do not have a license to establish immunities from § 1983 actions in the

20

interests of what we judge to be sound public policy." *Tower v. Glover*, 467 U.S. 914, 922-23 (1984). The "crucial question is whether the common law recognized the absolute immunities asserted." *Burns*, 500 U.S. at 499 (Scalia, J., concurring in the judgment in part and dissenting in part) (internal quotation marks, alteration, and citation omitted). In this case, it did not.[7]

## II

The panel opinion relied on the holding of *Libertarian Party* that judges who make licensing decisions receive absolute immunity to reach its conclusion about adversity. It said that "[o]ur [c]ourt's rationale for recognizing such decisions as judicial rather than administrative for purposes of determining judicial immunity in *Libertarian Party* applies equally for purposes of determining jurisdiction." *Kellogg*, 170 F.4th at 28 (citation omitted). And the concurrence defending the panel opinion emphasizes that, in this case, "[i]t is not possible to ignore *Libertarian Party*'s conclusion that

---

[7] The concurrence defending the panel opinion insists that the reconsideration of *Libertarian Party* "falls outside both the scope of the Plaintiffs' petition for rehearing [e]n banc and the scope of the poll that was called." *Ante* at 12 n.1 (Lohier, J., concurring in the denial of rehearing en banc). But we are not limited to the issues identified in the petition. The Federal Rules of Appellate Procedure provide that the active judges "may order that an appeal … be reheard en banc" either "in response to a party's petition" or "[o]n their own." Fed. R. App. P. 40(c). Our protocols provide that "[i]f a case goes [e]n banc, the Chief Judge, subject to review by a vote of the active judges should that be sought, shall determine the issues to be considered in an [e]n banc hearing after consultation with the proponent of the [e]n banc and the panel." Protocol 7, In Banc Protocol (approved Oct. 18, 2010, and amended Apr. 2, 2020). No rule would have prevented us from rehearing this case *en banc* to reconsider *Libertarian Party*, and by this dissenting opinion I am expressing the view that we should have done so.

21

what judges actually *do* under New York Penal Law § 400.00 amounts to a 'quintessentially judicial act.'" *Ante* at 10 (quoting *Libertarian Party*, 970 F.3d at 124).

That *Libertarian Party* wrongly decided that issue provides an additional reason to agree with the other dissent that "licensing decisions involve an exercise of regulatory authority on behalf of the government, not a neutral and impartial adjudication of rights." *Ante* at 16. There is therefore "adversity between the judge and the unsuccessful applicant." *Id.* at 13. I note two more reasons why rehearing is warranted to revisit the conclusion of the panel opinion on adversity.

**A**

First, the panel opinion "treat[s] the right recognized in *Heller* as a second-class right." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion). In the context of the First Amendment, a court will entertain a lawsuit challenging the denial of a license. The Supreme Court has entertained requests for injunctive relief from plaintiffs who were denied "permits to hold rallies" in a public park, *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 319 (2002), and plaintiffs who were denied a specialty license plate, *see Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207-08 (2015). The appellate courts entertain such challenges too. *See, e.g., Adams Outdoor Advert. Ltd. P'ship v. Pa. Dep't of Transp.*, 930 F.3d 199, 203 (3d Cir. 2019) (addressing a challenge to the denial of a "permit under a provision of Pennsylvania law that prohibits 'off premise' billboards within 500 feet of a highway interchange"); *Child. First Found., Inc. v. Fiala*, 790 F.3d 328, 337 (2d Cir. 2015) (addressing whether the "denial of [an applicant's] custom plate applications violated its free speech rights

22

under the First Amendment"), *opinion withdrawn and superseded on reh'g in part on other grounds*, 611 F. App'x 741 (2d Cir. 2015).

In those cases, as in this one, the defendant officials were tasked with "adjudicating whether the application satisfies the requirements of [applicable] law." *Kellogg*, 170 F.4th at 28.[8] The schemes in those cases featured "traditional judicial safeguards." *Kellogg*, 170 F.4th at 30 (quoting *Reule v. Jackson*, 114 F.4th 360, 366 (5th Cir. 2024)).[9] And the officials did not have "the authority to initiate enforcement actions." *Kellogg*, 170 F.4th at 28.[10] Nevertheless, a rejected applicant could bring suit to vindicate his right to the freedom of speech under the First Amendment.

I would not reach a different result for the right to keep and bear arms in the Second Amendment. "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights

---

[8] *See Thomas*, 534 U.S. at 318 ("The ordinance provides that … [a]pplications can be denied on any of 13 specified grounds."); *Walker*, 576 U.S. at 205 ("The relevant statute says that the Board 'may refuse to create a new specialty license plate' for a number of reasons, for example 'if the design might be offensive to any member of the public or for any other reason established by rule.'") (alteration omitted) (quoting Tex. Transp. Code Ann. § 504.801(c)).

[9] *See Thomas*, 534 U.S. at 318-19 (explaining that "[i]f the Park District denies an application, it must clearly set forth in writing the grounds for denial" and that "[a]n unsuccessful applicant has seven days to file a written appeal to the General Superintendent of the Park District"); *Walker*, 576 U.S. at 206 (recounting that the administrative board held "an open meeting," entertained "public comment," and provided written reasons for the denial).

[10] *See generally Thomas*, 534 U.S. at 318-20; *Walker*, 576 U.S. at 204-07.

23

guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780 (plurality opinion)).

**B**

Second, the panel opinion held that the availability of "judicial review by the Appellate Division in Article 78 proceedings" demonstrates that the judge acts judicially when evaluating a license application. *Kellogg*, 170 F.4th at 30. But it shows the opposite. In New York, an Article 78 proceeding is how one obtains judicial review of *administrative* action. Article 78 provides the "[r]elief previously obtained by writs of certiorari to review, mandamus or prohibition." N.Y. C.P.L.R. § 7801. Historically, these writs formed "the pillars of common law's system of administrative oversight" and "enabled public rights suitors to test the legality of action by early administrative bodies such as commissions, boards, and justices of the peace." James E. Pfander & Jacob P. Wentzel, *The Common Law Origins of Ex parte Young*, 72 Stan. L. Rev. 1269, 1277 (2020). Article 78 serves the same function by authorizing challenges to executive actions. Indeed, that is how the state courts of New York understand Article 78.[11]

---

[11] *See, e.g.*, *People v. Liden*, 19 N.Y.3d 271, 275 (2012) ("The usual way to obtain judicial review of the action of an *administrative agency* is a proceeding under CPLR article 78.") (emphasis added); *Levandusky v. One Fifth Ave. Apartment Corp.*, 75 N.Y.2d 530, 541 (1990) ("[C]hallenges to administrative agency decisions … take the form of article 78 proceedings."); *Rock v. N.Y.C. Emps.' Ret. Sys.*, 231 A.D.3d 979, 981 (2d Dep't 2024) ("The appropriate vehicle to review allegations sounding in improper administrative determinations and actions by governmental agencies is a CPLR article 78 proceeding.") (alteration omitted) (quoting *Charwat v. Kustas*, 233 A.D.2d 288, 288 (2d Dep't 1996)).

Article 78 is not how one obtains review of a *judicial* decision. The statute provides that "[e]xcept where otherwise provided by law, a proceeding under this article shall not be used to challenge a determination … which was made in a civil action or criminal matter unless it is an order summarily punishing a contempt committed in the presence of the court." N.Y. C.P.L.R. § 7801. The state courts have emphasized that a judicial decision must be reviewed on direct appeal and generally cannot be the subject of an Article 78 proceeding.[12] An "article 78 proceeding may not be used to challenge a determination made by a Judge in a civil action." *Branciforte*, 217 A.D.2d at 620. The use of Article 78 to review a determination made by a judge with respect to a license application indicates that the judge was not acting in a judicial capacity.

As noted above, Article 78 proceedings are "inappropriate vehicles to test the constitutionality of legislative enactments," *Overhill Bldg. Co.*, 28 N.Y.2d at 458, because the purpose of such proceedings is to evaluate the "legality of administrative action"

---

[12] *See, e.g., Hodge v. Lo Russo*, 181 A.D.2d 1009, 1009 (4th Dep't 1992) ("Supreme Court properly dismissed the proceeding against the remaining respondents because petitioner improperly utilized an article 78 proceeding to seek review of issues which could have been raised on direct appeal."); *Tyler v. Forma*, 231 A.D.2d 891, 891 (4th Dep't 1996) ("A CPLR article 78 proceeding is not the appropriate method to seek review of issues that could be raised on direct appeal."); *Branciforte v. Spanish Naturopath Soc., Inc.*, 217 A.D.2d 619, 619 (2d Dep't 1995) ("The Supreme Court properly dismissed the petition on the ground that it fails to state a cause of action upon which CPLR article 78 relief may be granted. Writs of mandamus, prohibition, and certiorari do not lie to review an appealable order or to correct an alleged error of law. *The proper remedy, if one is aggrieved by a court's decision, is to appeal the final order or judgment to the proper appellate court rather than to attack it collaterally by way of mandamus*.") (emphasis added).

under those enactments, *Town of Arietta*, 37 A.D.2d at 433. It is a mechanism for policing the conduct of executive officers. "The proper way to challenge any … licensure determination … is via a CPLR article 78 proceeding," *Hirschfeld v. Teller*, 14 N.Y.3d 344, 349 (2010), precisely because the licensing adjudicator is not acting as a judge.

The panel opinion additionally emphasized that "plaintiffs can sue judges in these state proceedings." *Kellogg*, 170 F.4th at 30 (citing N.Y. C.P.L.R. § 7804(i)). But if the plaintiff and the judge can be adverse litigants in state court, it follows that they are adverse litigants in federal court as well. "[D]etermining whether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). If the plaintiff and the judge face each other as adverse litigants in state court, nothing about the federal forum eliminates the adversity between those same litigants. Adversity is about the reality of "actual controversies." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (quoting *Muskrat v. United States*, 219 U.S. 346, 361 (1911)). It arises from the "*honest* and *actual* antagonistic assertion of rights." *United States v. Johnson*, 319 U.S. 302, 305 (1943) (emphasis added) (quoting *Chicago & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892)). Adversity is not a legal abstraction that applies only in federal court. If parties are adverse in state court, they are adverse in federal court too.

\*　　\*　　\*

When the defendant judge denied the firearms applications in this case, he acted as an executive officer of the State of New York. His adjudication of those applications did not "share[] enough of the characteristics of the judicial process" that he "should also be immune

from suits for damages." *Butz*, 438 U.S. at 513. He is therefore entitled to qualified rather than absolute immunity. And because he exercised regulatory authority on behalf of the state over the plaintiffs, the plaintiffs and the defendant are adverse parties.

I would rehear this appeal *en banc* to hold that the plaintiffs may seek injunctive relief and damages against a state official whom they allege subjected them to "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Because the court declines to do so, I dissent.